957 So.2d 724 (2007)
STATE of Louisiana
v.
Antoinette FRANK.
No. 1999-KA-0553.
Supreme Court of Louisiana.
May 22, 2007.
Rehearing Denied June 29, 2007.
*727 Capital Post-Conviction Project of Louisiana, Denise LeBoeuf, Nicholas J. Trenticosta, for Appellant.
Charles C. Foti, Jr., Attorney General, Eddie J. Jordan, Jr., District Attorney, Valentin Michael Solino, Michael Gerard Morales, Assistant District Attorneys, for Appellee.
KIMBALL, Justice.
In a previous direct appeal of this capital case, this court affirmed defendant's conviction for first degree murder in violation of La. R.S. 14:30, but found the district court erred in failing to declare defendant indigent for the purpose of allowing her the opportunity to show entitlement to state-funded expert assistance for the sentencing phase of her trial. State v. Frank, 99-0553 (La.1/17/01), 803 So.2d 1. Consequently, we pretermitted review of defendant's assignments of error regarding the penalty phase and remanded the case to the district court for it to hold an evidentiary hearing to determine whether the defendant was entitled to state-funded expert assistance for the penalty phase of her trial. On remand, the district court held several hearings at which the testimony of a legal expert, various mental health experts, and fact witnesses was introduced. The district court found that defendant was provided access to a mental health expert by her attorney and she refused his assistance. After noting this fact was undisclosed prior to the remand order, the district court concluded defendant was not entitled to a new sentencing phase of her trial.
For the reasons that follow, we find that because defendant was provided access to a mitigation expert by her counsel and refused the expert's assistance, she has not successfully shown that there existed a reasonable probability both that an expert would have been of assistance to the defense and that the denial of expert assistance resulted in a fundamentally unfair trial. Consequently, defendant has not shown prejudice in not obtaining state-funded expert assistance. We conclude she is not entitled to a new sentencing phase on this ground. Finding no reversible error in the remaining assignments of *728 error pretermitted in our original opinion, we therefore affirm defendant's sentence.

FACTS
This case involved a notorious triple murder in the early morning hours of March 4, 1995, at a restaurant in New Orleans East, the facts of which are set forth in our original opinion. Antoinette Frank, a New Orleans police officer who is the defendant herein, and Rogers Lacaze were arrested for the crime later that day. The victims were Ronald Williams, an off-duty New Orleans police officer performing security detail that evening at the restaurant, and Ha and Cuong Vu, two members of the family that owned the restaurant. On April 28, 1995, a grand jury indicted defendant and Lacaze on three counts of first degree murder. Lacaze was tried separately on July 17-21, 1995, found guilty as charged, and sentenced to death. His conviction and sentence of death have been affirmed by this court. State v. LaCaze, 99-0584 (La.1/25/02), 824 So.2d 1063. Defendant's trial began on September 5, 1995, and on September 12, 1995, the jury returned a guilty verdict on all three counts and recommended a sentence of death on all counts.

PENALTY PHASE
After introducing all the evidence presented in the guilt phase, the state began its presentation of evidence in the penalty phase by calling Dr. Philip Scurria, a psychiatrist who examined applicants to the police academy on behalf of the New Orleans Police Department. Prior to examining defendant, Dr. Scurria testified that he reviewed a written background investigation of defendant, the results of two psychological tests taken by defendant, and a report written by Dr. Drolley, a psychologist who administered the tests and recorded her interpretations of the tests. Dr. Scurria explained that Dr. Drolley's report rated defendant "poor" in "Tolerance/Openmindedness" and "Impulse Control." The report also indicated that defendant "faked good" on the test, which means that she tried to make herself appear better and more qualified than she was.
Dr. Scurria interviewed defendant for about 30 minutes. During the interview, he got the impression that she was preoccupied with making herself look good, which was consistent with the test results. He also noted she was a "name dropper." Dr. Scurria found her to be average in social maturity and tolerance, emotional stability, and competence and assertiveness. He found her to be unacceptable in integrity and forth-rightness. Dr. Scurria explained that he found her unacceptable in this category because the background investigation revealed that she had been terminated from a previous job, but in the interview she denied ever having any job-related problems or being fired from a job. Dr. Scurria opined defendant was below average in insight and empathy, sound judgment and common sense, freedom from psycho-pathology, and conventional and rule abiding. He found she was above average in her effectiveness in social relationships. Dr. Scurria stated that he believed she suffered from some psycho-pathology, but he saw no evidence that she suffered from any major psychiatric disorder. Dr. Scurria concluded that defendant was an unacceptable candidate for the police academy. He testified that the misrepresentation of her job history was a major factor in his decision to find her unacceptable.
In addition to Dr. Scurria's testimony in support of the state's case in chief in the penalty phase, jurors also heard two witnesses, John Stevens and Anthony Wallace, *729 describe a violent encounter with Lacaze, the co-perpetrator whom defendant had allowed to accompany her on official police business. They testified that after an argument with Lacaze, they were subsequently stopped by defendant, who was in a patrol car, and told to get out of the car. Lacaze exited the car with a gun and after a fight, the gun discharged. Based on the report by defendant, the incident led to the arrest of Wallace and Stevens and charges of attempted murder, armed robbery and resisting arrest, but those charges were later dropped. The state's penalty phase case ended with victim impact testimony from Mary Williams, Officer Williams's wife, and Nguyet Vu, the mother of two of the victims, who poignantly described through an interpreter how defendant and Lacaze had "stripped off Ha Vu's and Cuong Vu's hopes and dreams as well as Mrs. Vu's."
The defense began its sentencing phase presentation with the testimony of Irvin Bryant, Jr., a former civil sheriff's deputy who testified that he had seen Wallace pick up a gun during the incident involving Lacaze and point it in the direction of defendant and Lacaze. Defendant never removed her weapon from its holster, even when Wallace pointed the gun at her. He explained that after he grabbed Wallace, Lacaze ran toward them and he grabbed Lacaze also. The witness released Lacaze when defendant informed him that Lacaze was with her and told him to release him. The witness handcuffed Wallace with defendant's handcuffs and then the police arrived on the scene.
The defense next presented the testimony of Captain John Landry, a New Orleans Police Officer who was defendant's Commander in 1994. Captain Landry testified that defendant had won an officer-of-the month award in 1994 on the basis of her productivity in making arrests. Defense also presented the testimony of Mable Geniesse, defendant's mother's aunt, who informed jurors that she had known defendant since she was a little girl and that she had been "good and never did got in no trouble." Helen Adams, defendant's grandmother also testified. Ms. Adams praised defendant as "always a good child" and pleaded with jurors to spare her life. Finally, defense called defendant's mother, Mary Frank, who testified that defendant made good grades in school, and "never was in trouble. Never put out of school." Ms. Frank further stated, "I never had a problem with her coming home late. She never drank. She never smoked." Ms. Frank explained that defendant went to college at Delgado and was in her second year at the time of her arrest.[1] After the presentation of this testimony, the defense rested. During closing argument, defense counsel explained mitigating circumstances to the jurors and argued that defendant had no prior significant history of criminal activity, that the state's own psychiatrist recognized defendant had some psycho-pathology, that the offense was committed while the defendant was under the influence of extreme mental or emotional distress, that the defendant was a young offender, 23 years old at the time, and under the influence or domination of another, Lacaze, and that she was a principal whose participation was relatively minor.
The jury returned a recommendation of the death sentence on all three counts. Defendant was formally sentenced to death on October 20, 1995. Defendant *730 appealed her conviction and sentence directly to this court.

ORIGINAL APPEAL
On appeal, this court affirmed defendant's conviction, but we found merit to the defendant's assertion that the district court erred in failing to declare her indigent for the purpose of obtaining state-funded expert assistance for the sentencing phase of her trial. State v. Frank, 99-0553 (La.1/17/01), 803 So.2d 1 ("Frank I"). After determining that the district court abused its discretion in not declaring defendant indigent pre-trial, we considered what, if any, prejudice defendant suffered as a result of not being declared indigent. Frank I, 99-0553 at p. 6, 803 So.2d at 8. In considering this issue, we noted that in State v. Touchet, 93-2839 (La.9/6/94), 642 So.2d 1213, this court addressed the specific issue of the showing an indigent needs to make to obtain state-funded expert assistance as follows:
Henceforth, for an indigent defendant to be granted the services of an expert at the expense of the state, he must establish that there exists a reasonable probability both that an expert would be of assistance to the defense and that the denial of expert assistance would result in a fundamentally unfair trial.
Frank I, 99-0553 at pp. 7-8, 803 So.2d at 9 (quoting Touchet, 93-2839 at p. 6, 642 So.2d at 1216). We found that because the trial court did not allow a hearing on the matter, we did not have adequate information upon which to decide whether defendant was entitled to the state-funded expert assistance she requested and what prejudice she may have suffered as a result of not obtaining that assistance. Frank I, 99-0553 at pp. 9-10, 803 So.2d at 11. Consequently, we permitted review of defendant's assignments of error regarding the penalty phase of her trial and remanded the case to the district court for an evidentiary hearing at which defendant was to be afforded the opportunity to make the necessary showing under Touchet for obtaining state-funded expert assistance.

PROCEEDINGS ON REMAND
On remand of the case, the defense introduced the testimony of Dr. Sara Deland, a forensic psychiatrist, and Jim Boren, an attorney qualified as an expert in the preparation and trial of capital cases. The district court appointed three mental health experts to examine the defendant, Dr. Christine Turin, a clinical psychologist, Dr. Rafael Salcedo, a forensic clinical psychologist, and Dr. Richard Richoux, a forensic psychiatrist, and, following a joint interview, they testified at the hearing. The state introduced the testimony of Dr. George Seiden, a forensic and general psychiatrist, and Dr. Marc Zimmerman, a clinical psychologist who had met with the defendant prior to trial. In rebuttal, the defense called Mr. Robert Jenkins, defendant's trial counsel.
Dr. Sara Deland
Dr. Deland, accepted as an expert in forensic psychiatry, testified for the defendant as her mental health expert. She stated that she conducted an interview with defendant, and reviewed the raw test data and psychological reports that were done before defendant entered the police academy and the transcribed testimony of Dr. Scurria given at the penalty phase of defendant's trial. She also spoke briefly with defendant's mother.
Dr. Deland testified that in her interview with defendant, which lasted an hour and a half, defendant told her that during her childhood there were periods in which her father would scream and become physically violent with her mother. He would tear up the house, break refrigerators, *731 tear cabinets off the wall, break mirrors, and break windows. On one occasion, he killed a family pet in front of defendant. In addition, the defendant explained that her father would paint over the windows, wake up screaming in the middle of the night, sit up at night watching out the windows, and put booby traps in the house when he left so if the children came home and the parents were not home they would not open the doors. Dr. Deland also testified that defendant described to her an incident when her father parked the car on the railroad tracks with the children in it and threatened to sit there until the train hit them. Also, the defendant reported to Dr. Deland a history of sexual abuse by her father over a number of years resulting in several unwanted pregnancies, beginning at about age nine, and lasting into her later teens.
Dr. Deland also spoke briefly with defendant's mother, in which the mother described similar bizarre incidents by the father. Defendant's mother described him tearing up the house during one of his rampages, tearing all the cabinets off the wall and having to replace most of the furniture and even the refrigerator periodically because he would destroy them. She also described how he would become enraged suddenly and threaten the family and that he would become physically threatening and abusive towards her. Defendant's mother also corroborated that defendant's father would wake up screaming in the middle of the night and that he seemed different after serving in Vietnam. She told Dr. Deland that he was being seen at the V.A. Medical Center and that they were prescribing what she called "nerve pills" because of this.
Dr. Deland testified that chronic childhood trauma can produce long-lasting consequences affecting an individual for the rest of his or her life. She stated that there is literature in the psychiatric field documenting that the effects of chronic exposure of a child to violence, either directed at the child or even just around them, can cause physical chemical changes as the brain develops. She said a large body of evidence exists to show that significant changes in brain development may occur as a result of chronic stress and chronic abuse occasioned by living in violent circumstances. However, Dr. Deland concluded that she needed more information before she could assess the nature of the long-term results of defendant's childhood experiences. She stated that she believes certain mitigating circumstances exist which could be useful in preparation of the defendant's defense. Those circumstances include the domestic violence, the abuse in childhood, the mental illness in the family, the presence of a mentally ill parent in the home, and sexual abuse. Therefore, she opined that, on the basis of her first examination and the very preliminary information she possessed about the defendant's family and childhood, the psychiatric evaluation she could do could be useful in the preparation of a defense to the death penalty.
During cross-examination, Dr. Deland explained she believed that defendant opened up about her past abuse because it was impressed upon her by defense counsel that it was very important to be open. Defendant further indicated to her that the abuse was very difficult for her to talk about. On cross-examination, Dr. Deland freely conceded that the reports of the doctors who had examined defendant in connection with her application to the police academy did not record any instances of childhood sexual or physical abuse, but she pointed out that the doctors "were seeing her for potential employment which is a different type of examination and, generally, if you don't specifically ask about these things, they generally don't *732 just come forth on their own." However, Dr. Deland also acknowledged, when presented with a six-page report of the intake interview conducted with defendant at LCIW in October 20, 1995, that defendant reported, "Typical childhood. No problem at home. Perfect sibling relationship. No problem at school." In the same interview, defendant stated that her mother was the disciplinarian in the family who used "restriction" as punishment and that when asked directly whether she had been the victim of physical or sexual abuse, defendant had denied it. Additionally, defendant denied a family history of mental problems. Dr. Deland conceded that, aside from talking to defendant's mother, she had not conducted any investigation to determine whether defendant was a victim of abuse. Finally, Dr. Deland acknowledged that ordinarily the trauma caused by childhood abuse manifests itself in behavior or adjustment problems later in life and that defendant's apparent successful social adjustments, i.e., graduating from high school, enrolling in college, becoming a police officer, rendered her atypical.
Jim Boren
Mr. Boren, who was qualified as an expert attorney in the preparation and trial of capital cases, testified that it is essential that a thorough social history be conducted on defendant. He further testified that proper preparation for a capital trial required the defense to obtain such a history and consult the appropriate experts using the information contained in the history. Mr. Boren stated that, if mental health evidence was introduced by the state, he would also require an expert to help blunt or rebut the intended use of the evidence as aggravation. Also, he noted that defense counsel would want the mental health expert to advise him on the presentation of mitigating mental health evidence, after reviewing the defendant's history. Mr. Boren testified that, in his opinion, there is no question the defendant should be entitled to funds to hire a person to do a life history because this is a tool with which she can help defend herself. He added that he believes she is also entitled to a psychiatrist because of the different role the doctor would play in her defense.
Drs. Christine Turin, Rafael Salcedo, and Richard Richoux
The district court's appointed panel of independent experts interviewed defendant together for approximately an hour and a half in the jury room of one of the court rooms in the Criminal District Court just before testifying in open court. The doctors relied solely on their personal interchange with defendant and did not administer any psychological tests. The panel also had access to defendant's records from LCIW, the reports of Drs. Scurria, Barnes, Franklin, and Drolley, and a transcript of Dr. Deland's testimony.[2] Although they disagreed on specific points, all of the doctors agreed that defendant's history revealed a significant discrepancy between the account of childhood sexual and physical abuse she had given Dr. Deland and repeated for their benefit on that morning, and the results of her prior social histories and examinations in which that abuse was never mentioned. In particular, Dr. Salcedo thought that defendant's responses during her in-take interview at LCIW raised a "red flag" because she had been asked explicitly and directly about *733 childhood physical and sexual abuse and denied that the abuse had occurred. Dr. Turin spoke for all members of the panel when she testified that defendant "told us about her tough time growing up and how many things she overcame in becoming a police officer and then, you know, her life seemed to be going in a real positive direction and then, all of sudden, there's this event that doesn't fit in with anything."
The doctors on the panel agreed with Dr. Deland that it is atypical that someone reporting childhood sexual and physical abuse would otherwise not show any behavioral or adjustment problems. Doctor Richoux thought it possible "but, speaking in general terms, I would think most people with that history would have some manifestation of it either in school or in the course of their worklife." Doctor Salcedo agreed that a remarkably resilient individual might make his or her way in life without showing any outward behavioral problems, but a majority would show some adjustment difficulties in school or in life. In fact, defendant's apparent lack of adjustment problems until she became involved in the triple murder led Dr. Salcedo to question the possibility that she suffered from post-traumatic stress disorder ("PTSD"). He found remarkable that in "page after page of literally years of observation and documentation" from LCIW the records did not "show much, if anything, in the way of any affective or emotional pain." "There's this detachment is what I sense from those notes," he explained, "and it's not just Dr. Breaux, but it's other people that observe her in saying that she's fine, and polite, and she's cordial, and just asked for something to read, and doesn't seem to be all that perturbed, or affected, or distressed over anything even as she sits on Death Row." Under these circumstances, Dr. Salcedo remained skeptical "that you could diagnose someone as suffering from PTSD when they display no impairment in social or occupational functioning, they're not displaying any disability, they're not in subjective distress, seemingly, or any affective pain, and when you're losing all of the legs of your diagnosis as you eliminate those things. . . . Dr. Turin talked about the need for longitudinal observational data. I think we have some of that already in those notes."
At the same time, no member of the panel would commit to an opinion that defendant lied about the abuse she had received from her father. They all agreed that defendant's failure to report the abuse to any physician before she spoke to Dr. Deland did not necessarily mean her account of the abuse to them was not reliable. In particular, Dr. Richoux did not find it at all unusual that defendant did not mention sexual abuse in her NOPD application or screening interviews in which, like anyone else, she would try to present as positive and favorable image of herself as she could. Nor did Dr. Salcedo find it unusual that defendant did not mention the abuse to corrections officials at LCIW because she had to have had substantial doubts that anyone at the facility would have particularly cared that the abuse had occurred. Although the LCIW records showed that defendant had been diagnosed as a narcissistic personality with anti-social tendencies, the panel members did not find the arrogance and lack of empathy characteristic of that personality disorder. Defendant responded to their questions cordially, and what Dr. Salcedo "experienced seeing today was someone who was very emotional, and seemingly overwrought, and emotionally distressed." The doctors also found some evidence of PTSD in defendant's admission that she avoided television problems addressing childhood sexual abuse because she found them too painful to watch.
*734 As to the issue of whether defendant was telling the truth about childhood sexual and physical abuse, all panel members agreed that further evaluations of defendant and further collection of data from all available sources of information was necessary before they could reach a firm conclusion. Doctor Salcedo testified that in that regard defendant was "not acting crazy and she's not acting like malingering in the classic sense, but the motivation for her reporting information that could be false . . . [is] certainly a possibility and it's also possible that it's bona fide information and that she, for some reason that I am not aware of, decided or chose to reveal it at this point in time." Thus, the doctors all agreed that if they had been advising the defense as mitigation experts they would have recommended obtaining as much corroboration as possible from family members, neighbors, schoolmates and school teachers, medical records of defendant's mother and especially of her father.
Dr. George Seiden
Dr. Seiden, who was retained by the state, testified that he reviewed various documents relating to defendant's case, including materials and transcripts of testimony from the other doctors who had interviewed defendant, but that he never actually conducted an examination on defendant personally. Dr. Seiden stated that what struck him odd about the evaluation by the court-appointed panel was that the three of them decided to interview the defendant together. He went on to say it would be preferable to have three different interview times to look at consistencies versus inconsistencies in defendant's responses.
Nevertheless, Dr. Seiden testified from the material he reviewed that there was nothing in defendant's history prior to her report of sexual abuse that would have suggested its occurrence. He stated, "There are certain things that you see in the behavioral patterns of people who had the pattern of sexual abuse that she is now reporting. And none of those were present in her history and the history that she reported or in the evaluations that were done prior to trial." Accordingly, Dr. Seiden testified that he drew the conclusion that her history was inconsistent with the current report of sexual abuse. However, he conceded that behavior of a parent afflicted with PTSD could have a profound effect on any child exposed to it. Furthermore, he noted that there is a possibility that susceptibility to PTSD may be partly genetic and that someone who has inherited a predisposition to the disorder may be vulnerable to mental illness if he or she is traumatized under the stress of environmental influences.
Dr. Seiden discounted altogether child sexual abuse as a mitigating circumstance in this case because it had no connection to this particular crime. To the extent that defendant did not display any behavioral symptoms indicative of the abuse, Dr. Seiden saw "essentially . . . two possible conclusions. One is that the abuse did not happen, or two, if it did happen, that she was healthy enough or psychologically resilient enough that she handled it without it affecting her behavior during her adult life." Dr. Seiden attached significance to the in-take diagnosis made by Dr. Breaux at LCIW in October, 1995, that defendant possessed a narcissistic personality with anti-social tendencies. That diagnosis was not a mitigating circumstance, Dr. Seiden opined, because narcissists with antisocial features "are the dangerous and evil people in our world." That characterization brought an objection from defense counsel, but Dr. Seiden maintained that defendant fit the profile because the available information suggested "the absence of empathy, the tendency to exploitation in *735 relationships, the willingness to offend others, and the absence of any feelings of guilt, all of those things would support that diagnosis."
Lastly, Dr. Seiden testified that he reviewed the MMPI II test, taken before employment with the police department, which tells whether a person is being honest and to the extent that they are not being honest. Dr. Seiden testified that defendant invalidated the test by trying to look too good. He described that she tried to present herself as "unrealistically virtuous;" however, despite that attempt she still reached clinical significance on scale four, which is the psychopathic deviate scale, which reveals evidence of authority conflict and rebelliousness. He further testified that he expects someone to try and present themselves favorably when they are being evaluated for pre-employment, but he does not expect them to invalidate the test completely, as defendant had done. Dr. Seiden acknowledged at the conclusion of his testimony that an expert such as himself could be useful to the defense to minimize the effect of testimony from the state's mental health experts, and to decide what evidence to highlight or avoid.
Dr. Marc Zimmerman and Robert Jenkins
Dr. Zimmermann, an expert forensic psychologist, testified for the state that defendant's trial counsel, Robert Jenkins, had approached him in the office of the Orleans Parish Indigent Defenders Program (OIDP) and had asked him to interview the defendant as a mitigation expert in anticipation of the penalty phase.[3] Dr. Zimmerman testified that he normally charges between $2,000 and $3,000 per case as a mitigation expert, and that he went to see the defendant on the assumption that OIDP would pay his fee. However, Dr. Zimmerman did not recall having a conversation about money with Mr. Jenkins. Dr. Zimmerman could not recall exactly when he had seen the defendant in jail before trial but he estimated that he had spent about thirty minutes with her and that she ultimately indicated that *736 she did not want his services as a mitigation expert. He stated there was no doubt in his mind when he walked out of the interview with defendant that she knew he was there to discuss mitigation. He also testified defendant knew he was there to help her, there was no possible miscommunication between himself and defendant, and when she declined his services, that's exactly what she was doing. However, he acknowledged that it was not unique in his experience as a forensic psychologist that a capital client was initially reluctant to speak with him. He stated that in the past when this has occurred, he goes back with an investigator or a lawyer, someone the client trusts, and then conducts a fuller interview. However, Dr. Zimmermann testified that, while he conveyed defendant's refusal to speak to him to Mr. Jenkins, he was not asked to speak with defendant again until after defendant's conviction in the guilt phase but before the penalty phase, when he was approached by Mr. Jenkins and asked to help with mitigation evidence in the penalty phase. The doctor replied that he declined to assist because there was simply not enough time to work on the case at that point.
Mr. Jenkins testified that the problem with the interview with Dr. Zimmermann was that he was not in attendance, and defendant had previously stated that she did not want to be interviewed without her attorney present. He went on to explain that he was concerned about getting Dr. Zimmermann paid because he was told by the head of OIDP that he could not compensate the doctor without a declaration of indigency, and the district court would not declare her indigent. He further explained that the only way he could have accompanied Dr. Zimmermann to visit the defendant again was if the court had declared her indigent. Therefore, once he learned the court's ruling that she was not indigent and that the defense would not be receiving any money for expert mitigation assistance, he could not have accompanied the doctor for another visit. Mr. Jenkins remained firm in his testimony that the problem with obtaining expert mental health evidence for the defendant was always the denial of indigent status by the trial court.

DISTRICT COURT'S RULING
At the close of the presentation of testimony, the district court heard argument from each side. The arguments focused on the significance of Dr. Zimmerman's pre-trial visit to defendant. The defense argued, as it does in its brief to this Court, that Jenkins's testimony provided the only logical and reasonable explanation for why Dr. Zimmerman did not return to evaluate defendant after his initial visit with her ended unsatisfactorily and that the lack of state funding for a mitigation expert, as opposed to the defendant's refusal to speak to Dr. Zimmerman, therefore explained the absence of substantial mitigating evidence at the penalty phase. The state argued that defendant had, throughout the guilt and sentencing phases of trial and for whatever reason, consistently refused expert assistance and thereby dictated how the defense would proceed. In the state's view, the defendant had not been denied a fundamentally unfair sentencing hearing because she had declined the kind of expert assistance that she now argued should have been provided by the state. In the end, the district court ruled as follows:
She had an expert. She had Dr. Zimmerman, who was not employed by the Court who was employed by her attorney. Any kind of way that you want to call that, the man functioned as an employee. He went to her to interview her. She refused. Dr. Zimmerman *737 went back to the defense attorney. And, when did we find out about all of this? I just found out about it. It was never brought to my attention that there was an expert that was chosen by the Defense Counsel for Ms. Frank and she refused.
But one thing is consistent in this case. She has refused the help of experts throughout the whole case. Pre-trial. During the trial. And, after the trial, to an extent. And, I find that very consistent in what she wanted to do. And I listened to Ms. Frank.
It would be ludicrous now for me to grant your motion. . . . I find she was not prejudiced, and I don't think that she is entitled to another penalty phase, and that is my ruling.
Following the district court's ruling, defendant appealed directly to this court.

DISCUSSION OF STATE-FUNDED EXPERT ASSISTANCE
The remand order on original appeal in Frank I touched on the cornerstone of the Supreme Court's evolving capital jurisprudence over the past thirty years. In the context of a capital case, a critical component of a fundamentally fair trial of the penalty phase that comports with the requirements of the Eighth Amendment is that "the jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime." Blystone v. Pennsylvania, 494 U.S. 299, 304-05, 110 S.Ct. 1078, 1082, 108 L.Ed.2d 255 (1990)(internal quotation marks and citation omitted). Defense counsel has a correlative duty to conduct "an investigation of the defendant's background for possible mitigating evidence." State ex rel. Busby v. Butler, 538 So.2d 164, 169 (La.1988). That duty may encompass a request for state-funded assistance in investigating and presenting mitigating evidence at a capital sentencing hearing on behalf of an indigent defendant. State v. Craig, 93-2515 (La.5/23/94), 637 So.2d 437. In Ake v. Oklahoma, 470 U.S. 68, 83, 105 S.Ct. 1087, 1096, 84 L.Ed.2d 53 (1985), the Supreme Court held that a state-funded psychiatric expert is a "basic tool" for a defendant's case, "when the defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial." 470 U.S. at 83, 104 S.Ct. at 1096. The Court also stated that "where the consequence of error is so great, the relevance of responsive psychiatric testimony so evident, and the burden on the State so slim, due process requires access to a psychiatric examination on relevant issues, to the testimony of the psychiatrist, and to assistance in preparation at the sentencing phase." Ake, 470 U.S. at 84, 105 S.Ct. at 1097. The Supreme Court has also explained that mitigation evidence encompasses "any aspect of the defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). This evidence may include such mitigation as a defendant's disturbed and violent upbringing. Eddings v. Oklahoma, 455 U.S. 104, 115, 102 S.Ct. 869, 877, 71 L.Ed.2d 1 (1982).
In Craig, we upheld a trial court decision ordering payment for the services of an investigator, a psychologist, and a mitigation expert, finding that those services were necessary to provide the indigent defendant with an adequate opportunity to present his defense. However, we emphasized that an indigent defendant wishing to obtain funding for the production or gathering of any evidence must make a showing *738 of the necessity for those services. Craig, 93-2589 at p. 13, 637 So.2d at 447.
We elaborated upon that holding in Touchet when we addressed the specific issue of what showing an indigent needs to make in order to obtain state-funded expert assistance. We stated that, for an indigent defendant to be granted the services of an expert at the expense of the state, he or she must establish that there exists a reasonable probability both that an expert would be of assistance to the defense and that the denial of expert assistance would result in a fundamentally unfair trial. Touchet, 93-2839 at p. 6, 642 So.2d at 1216. To meet this standard, we explained, a defendant must ordinarily establish, with a reasonable degree of specificity, that the assistance is required to answer a substantial issue or question that is raised by the prosecution's case or to support a critical element of the defense. If the trial court finds that the indigent defendant is able to meet this standard, it must authorize the hiring of the expert at the expense of the state. Id.
In the instant case, the record on remand establishes that defendant was provided access to a mental health expert for mitigation purposes by an expert of her counsel's choosing, but she refused his assistance.[4] In fact, defendant consistently refused throughout this case to cooperate with mental health experts. She refused to be interviewed pre-trial by a court-appointed forensic psychiatrist regarding her competency.[5] She refused to cooperate pre-trial with the mitigation expert sent by her own attorney. She again refused to be examined post-trial by the court-appointed psychiatrist for the Uniform Capital Sentencing Report. In this court's original opinion, we rejected the state's argument that a remand was unnecessary because defendant's refusal to cooperate with a court-appointed psychiatrist for the purpose of determining whether she was competent to stand trial meant she would not cooperate with any other evaluation for purposes of presenting mitigating evidence. See Frank I, 99-0553 at *739 p. 9 n. 5, 803 So.2d at 10 n. 5. However, it was revealed at the hearing on remand that defendant had in fact refused before trial to cooperate with a mitigation expert chosen by her attorney. This fact was unknown to the courts prior to the presentation of Dr. Zimmerman's testimony at the hearing on remand.
In light of the fact that defendant was provided access to a mitigation expert by her attorney and refused to be interviewed by him, we cannot say under Touchet that there exists a reasonable probability that a mitigation expert would have been of assistance to the defense. While the experts testified on remand that further evaluation of defendant and her psycho-social history, including her claims of abuse, was warranted and that a mental health expert could have aided the defense in responding to the state's case, the nature of defendant's claims appears to preclude such help without defendant's cooperation, which was not forthcoming pre-trial. Defendant's current allegations of childhood abuse and her father's mental illness were not revealed until after her conviction and sentence were imposed. In fact, prior to her interview with Dr. Deland, the issues of abuse and familial mental disease were specifically denied by defendant. Although defendant's mother corroborated a portion of the allegations defendant made to Dr. Deland when Dr. Deland questioned her, she and other family members who might have been expected to corroborate evidence of abuse and of the father's strange and often violent behavior testified at the penalty phase and failed to raise the issue. Defendant has produced no other corroborating evidence that was available prior to trial that an expert could have made use of in the absence of defendant's assistance.
The defense contends that defendant refused to cooperate with the mitigation expert they provided her because she had made it clear she would not talk to mental health experts without them. However, they failed to explain why they sent the expert to interview defendant without one of her attorneys being present. Defendant freely spoke to Drs. Deland, Turin, Salcedo, and Richoux about her childhood in the absence of her attorneys during the evaluations conducted for purposes of the hearings on remand.
Defendant's failure to cooperate pre-trial with the mitigation expert chosen by her attorneys also convinces us that her sentencing proceeding was not fundamentally unfair. She was not denied access to mitigation expert assistance by the district court's error in not declaring her indigent. Rather, she refused the services of the mitigation expert of her own volition. There was no interference by a state actor that denied her access to mental health expert assistance. Thus, the district court's erroneous ruling did not result in a fundamentally unfair trial.
Defendant has not successfully made a showing under Touchet that there existed a reasonable probability both that an expert would have been of assistance to the defense and that the denial of expert assistance resulted in a fundamentally unfair trial. She had access to a mitigation expert and refused his services. In Ake, the Supreme Court stated a defendant has a right of access to an expert mental health evaluation and his assistance in defense of the case. Defendant was provided such access and failed to take advantage of it. Consequently, defendant has not shown prejudice in not obtaining state-funded expert assistance. See Frank I, 99-0553 at pp. 9-10, 803 So.2d at 11 (stating that the trial court's failure to hold a hearing provided inadequate information upon which this court could review the question of whether defendant was entitled to the expert *740 assistance she requested for the penalty phase of her trial and what prejudice she may have suffered as a result of not obtaining state-funded assistance). See also State v. Juniors, 03-2425, p. 58 (La.6/29/05), 915 So.2d 291, 333 (finding defendant failed to demonstrate that the denial of the expert assistance substantially prejudiced him at trial); State v. Prestridge, 399 So.2d 564, 581 (La.1981) (stating that when an indigent defendant has been denied funds to obtain expert assistance, the issue on review becomes whether the denial of funds substantially prejudiced the defendant at trial). We find no error in the trial court's ruling in this regard.

ASSIGNMENTS OF ERROR RELATING TO PENALTY PHASE
Because we find defendant is not entitled to a new penalty phase of her trial, we now turn to the remaining assignments of error regarding her penalty phase that we pretermitted in our original hearing.[6]
Impermissible Elicitation of Expert's Opinion
In her twenty-fourth assignment of error, defendant argues that the state impermissibly elicited the basis for its expert witness's opinion at the penalty phase of the trial.
Defendant claims that throughout the state's direct examination of Dr. Scurria, he testified that his opinion of the defendant was partially based on psychological testing conducted by Dr. Drolley, information he had received from a "background investigation," and the reports of Dr. Franklin and Dr. Burns. According to defendant, the admission of this evidence violates La. C.E. art. 705(B).[7] Defense counsel, however, stipulated and agreed to the admission of these records, and as a general rule, any objections to testimony forming the basis of a stipulation are waived. In State v. Fabacher, 362 So.2d 555, 557 (La.1978), this court held that, although forgery of endorsement on a check was not charged in the bill of information, defense counsel stipulated that defendant had forged an endorsement on the check during the course of trial. This stipulation constituted a waiver by defendant of any complaint on the basis of a variance between allegations of information and evidence offered in support thereof. See also Tutorship of Taylor, 329 So.2d 910, 912 (La.App. 2nd Cir. 1976); State v. Issac, 527 So.2d 1045, 1051 (La. App. 5th Cir.1988). Consequently, because defendant stipulated to the admission of these records, she cannot now raise the issue as error on appeal. Consequently, this assignment of error is without merit.
Closing Argument
In these assignments of error, defendant contends that the state's closing argument at the penalty phase violated her due process rights and her right to a reliable sentence. Specifically, defendant argues *741 that the state misrepresented the facts, misstated the law, improperly argued the necessity of a death sentence, asked the jurors to put themselves in the victims' place, argued that the jury sentence defendant to death because as a police officer she had violated the public trust, called for a hasty verdict, misrepresented the jury's role, and improperly argued that life in prison was too easy.
At the outset, we note that prosecutors are allowed wide latitude in choosing closing argument tactics. State v. Legrand, 02-1462, p. 16 (La.12/3/03), 864 So.2d 89, 101. La. C.Cr.P. art. 774 confines the scope of argument to "evidence admitted, to the lack of evidence, to conclusion of fact that the state or defendant may draw therefrom, and to the law applicable to the case." The trial judge has broad discretion in controlling the scope of closing argument. Id.; State v. Prestridge, 399 So.2d 564, 580 (La.1981). Even if the prosecutor exceeds these bounds, we will not reverse a conviction if not thoroughly convinced that the argument influenced the jury and contributed to the verdict. See State v. Martin, 93-0285 (La.10/17/94), 645 So.2d 190, 200; State v. Jarman, 445 So.2d 1184, 1188 (La.1984); State v. Dupre, 408 So.2d 1229, 1234 (1982).
First, defendant contends that, with no evidence to back up their assertions, prosecutors argued that the defendant pistol whipped one of the victims and that she planned the entire crime:
They knew they were going to die. They knew that. She pistol whipped him. . . . Antoinette Frank was the one who was planning this robbery. That was her who was moving everything forward . . . in each instance, that it's Antoinette that is assuming the leadership role. Antoinette that is leading the way . . . It's Antoinette Frank that steals those keys . . . It's Antoinette Frank who steals those phones . . . And, of course, it's Antoinette Frank that executes these people with numerous, numerous shots. . . . Antoinette Frank did this, and this, and this, and this, and this, and this, and this, and this and created that scene. (State simultaneously referring to crime scene photographs). . . .
Despite defendant's assertions, the district attorney's argument did not violate the requirements of La.C.Cr.P. art. 774, which specifically allows for closing argument to contain conclusions of fact the state may draw from the evidence admitted. The comments to which defendant points are based on the evidence as the two bodies were found in kneeling positions, and one of the victims had wounds consistent with a "pistol whipping." Therefore the statements fall within that range of conclusions the state may permissibly draw during closing argument. State v. Bretz, 394 So.2d 245, 248 (La.1981). See also State v. Clark, 387 So.2d 1124, 1131 (La.1980)(prosecutor's closing argument placing defendant at wheel of car held a "reasonable conclusion from the facts in evidence," which included evidence that placed defendant's car near scene of crime to which defendant was otherwise linked).
Next, defendant contends that the prosecutor misstated the law. First, appellate counsel claims that the state told the jury that the Legislature mandated the death sentence for the defendant:
The People of Louisiana, through the Courts, through the Legislature have determined that one crime deserves one penalty. One crime is so heinous . . . [t]he people of Louisiana have decided that one who takes life in a first-degree murder should face the taking of heir *742 [sic] own life. . . . The law says that she deserves death.
In the instant case, despite the prosecutor's remarks, it is unreasonable to believe the jury did not understand the gravity of their duty and the finality of their decision, as this responsibility was impressed upon them several times during the court's jury instructions:
[W]e're now to determine whether the defendant should be sentenced to death or life imprisonment without benefit or parole, probation, or suspension. . . . Before you decide the sentence of death should be imposed, you unanimously must find beyond a reasonable doubt, one of the aggravating circumstances. If you find beyond a reasonable doubt that an aggravating circumstance exists, you may consider imposing the death sentence. The finding of an aggravating circumstances [sic] does not mean that you must impose the death sentence. If however, you do not . . . unanimously find beyond a reasonable doubt a statutory aggravating circumstance . . . then life imprisonment, without benefit of probation, parole or suspension of sentence is the only sentence that can be imposed. Even if you find the existence of an aggravating circumstance, you must also consider any mitigating circumstances before you decide that a sentence of death should be imposed. . . . Nothing said or furnished you in these instructions should be taken as an opinion of the Court as to the existence or non-existence of statutory aggravating or mitigating circumstances, or as an opinion concerning the appropriate sentence to impose. It is your responsibility in accordance with the principles of law I have instructed to determine whether the defendant should be sentenced to death or life imprisonment without benefit of probation parole or suspension of sentence.
In light of these admonitions, we find the jury was properly informed of the seriousness and finality of their decision as to the defendant's punishment.
In addition, it should be noted that defense counsel did not object to the comment about which defendant now complains. Although the lack of objection does not preclude the issue from review, in this pre-Wessinger penalty phase proceeding,[8] this court has noted that "the lack of an objection is a factor to be considered in examining the impact of a prosecutor's closing argument;" and "the lack of an objection demonstrates the defense counsel's belief that the live argument, despite its appearance in the cold record, was not overly damaging." State v. Taylor, 93-2201, p. 22 n. 10 (La.2/28/96), 669 So.2d 364, 376. Accordingly, this portion of the assignment of error lacks merit.
Next, the defendant argues that the state misled the jury by stating that the mitigating factor of "no significant prior history of criminal activity" was not applicable to the defendant, despite the fact that she had never even been arrested or charged with another crime. Apparently, in arguing that the defendant did indeed have a criminal history, the state was *743 referring to the penalty phase testimony of John Stevens and Anthony Wallace that the defendant had assaulted and falsely imprisoned Wallace after an altercation with Lacaze. While it is well-settled that the prosecution may not argue that a particular factor should not be a mitigating circumstance, it is acceptable for the state to try to disprove the existence of a mitigating factor. State v. Hampton, 98-0331, p. 22 (La.4/23/99), 750 So.2d 867, 886. In the instant case, the prosecutor's comment was intended to show why the mitigating factor raised by the defense in its closing argument was not applicable in the instant case. The prosecutor's comment discarding the defendant's lack of a criminal history was pointed out that, according to penalty phase testimony, defendant had assaulted and falsely imprisoned Wallace, even though she was never charged with the crime. Accordingly, this argument lacks merit.
Next, the defendant claims that the prosecutor improperly argued the "necessity of a death sentence." Specifically, defendant points to the following excerpt from the state's penalty phase closing argument:
Christ said in the very beginning, because he knew that men governed other men. And, so, remember that part in the Bible where he said "render unto Caesar that which is Caesar's and render unto God, that which is God's." That's Caesar and we want him to sentence her to death, based upon your recommendation. . . . Let me tell you something; Antoinette Frank not only deserves to die, she needs to die.
As an initial matter, we note defense counsel did not object to these remarks. Nevertheless, despite defendant's contentions, this court has not found such arguments reversible. See State v. Howard, 98-0064, pp. 31-21 (La.4/23/99), 751 So.2d 783, 816-17 (opening statement in penalty phase of capital murder trial, that referred to defendant as a "thing" that deserved the death penalty, was not reversible error under either harmless-error standard or review of errors affecting fundamental fairness of the proceedings and reliability of sentencing verdict, even though statements were unprofessional attacks and came dangerously close to reversible error); State v. Taylor, 93-2201 at 21-22, 669 So.2d 364, 375-76 (La.1996)(prosecutor's statement that giving the death penalty is "the right thing to do," and that, "anything else would be a disgrace" not reversible error); State v. Summit, 454 So.2d 1100 (La.1984) (although prosecutor may not suggest that protections to the rights of the accused are inconvenient hindrances, he may compare the trial afforded the defendant to the "summary execution" of his victim, even to the extent of asking the jurors to give defendant the "same justice" that he gave to the victim). Any perceived error contained in this portion of the argument is harmless. Additionally, this court will not reverse a conviction or sentence on the ground of improper closing argument unless it is thoroughly convinced that the remarks influenced the jury and contributed to the verdict. Taylor, 93-2201 at p. 21, 669 So.2d at 375. Giving deference to the good sensibility and fairmindedness of juries, State v. Bourque, 96-0842 (La.7/1/97); 699 So.2d 1, 5, and after reviewing the argument as a whole and the limited nature of the prosecutor's objectionable comments therein, we can conclude that the comments did not influence the jury or contribute to the death sentence.
Defendant also claims that the state violated the "golden rule" of asking the jurors to put themselves in the victims' places. Specifically, defendant point to the *744 following excerpt of the state's penalty phase closing argument:
So, I ask you now, to listen as you look at the circumstances of this offense, the nature of this offense. And, I ask you again, to do this on behalf of these people. . . . I would ask you to look in your mind's eye, and I would ask you to consider and to see the horror of the last few minutes of these lives. That's what this is all about. I ask you to see in the mind's eye what these people experienced. . . . [T]he horror that they lived through . . . the last thing he saw . . . the last thing he ever sees. And what's the last thought you're going to have if you're going to be killed instantly? Shock . . . pain, despair. . . . And, the knowledge, in fact, that he was about to die.
Again, as an initial matter, we note no objection was raised to this portion of the state's argument. In State v. Wessinger, this court held similar remarks in which the prosecutor urged jurors to put themselves in the victim's position just before he or she died and to show the defendant no more mercy than he showed the victim, while arguably improper, were not so prejudicial that it would befuddle jurors into disregarding the law as given to them by the trial judge. See also State v. Monroe, 397 So.2d 1258, 1271 (La.1981)(this court criticized the "eye for an eye, a tooth for a tooth" argument as improper but found no reversible error since the argument when considered as a whole lost "much of its objectionable flavor."). Thus, in the instant case, while the prosecutor's argument was arguably improper, once again the remarks did not urge the jury "to disregard the law as given to it in the instructions of the trial court." id., and therefore, this claim does not present grounds for reversal.
In this assignment of error the defendant also claims that it was improper for the state to argue that the jury should sentence her to death because of her status as a police officer and her "betrayal" of the public trust. Defendant's main contention is that this is not an enumerated consideration under Louisiana's "approved system of aggravating and mitigating factors." set out in La.C.Cr.P. art. 905.4. However, despite the fact that the defendant's status as a police officer does not qualify as an aggravating circumstance at sentencing in a capital trial, the district attorney's argument was a fair comment on the evidence and addressed defendant's character. La.C.Cr.P. art. 905.2; State v. Bourque, 96-0842, p. 14 (La.7/1/97), 699 So.2d 1, 10-11 (evidence about an incident during which the defendant used derogatory language toward victim and victim's mother admissible in penalty phase of capital trial as it went to defendant's character and propensities). Consequently, this argument was not improper.
Defendant also claims that the state's closing arguments at the penalty phase impermissibly diminished the jury's sentencing role and the gravity of the proceedings. First, defendant complains of the state's comment to the jury that, "[y]a'll came back in about 20 minutes with a verdict of guilty as charged. It ought to take you about 10 to come back with a recommendation of death. Thank you." In this same claim, defendant also argues that the state repeatedly argued that the jury's sentencing verdict is "just a recommendation."
Again, defense counsel raised no objection to this portion of the state's argument. Nevertheless, a review of the passages cited by defense counsel reveal that the prosecutor did not refer to the decision as "just" a recommendation, but instead asked the jury to "recommend" the death *745 penalty and "just recommend it." Neither of the prosecutor's arguments likely misled jurors as to the finality of their decision to impose the death sentence, when the jurors were properly informed of seriousness and finality of their decision by the trial judge. State v. Wessinger, 98-1234, pp. 27-28 (La.5/14/99) (prosecutor's reference to jury's penalty phase decision as recommendation did not mislead jury as to finality of decision to impose death sentence when jury was properly informed of seriousness and finality of their decision by prosecutor and trial judge); State v. Williams, 96-1023 p. 26 (La.1/21/98), 708 So.2d 703, 723 (court rejected similar argument that the court lessened the juror's sense of responsibility by using the word recommendation in describing the jury's sentence). Accordingly, we find no reversible error disclosed by this argument.
Next, in a similar argument, the defendant claims that the prosecutor erred by commenting on prison life, stating:
Then, [defense counsel] wants to talk to you about the horrors of 40 years locked in a little cage. . . . Just take a ride up to Angola or Hunt and look around. That's not the way life is up there.
This court has previously held that references to prison lifestyle are improper. State v. Scales, 93-2003, p. 11 (La.5/22/95), 655 So.2d 1326, 1334; State v. Kyles, 513 So.2d 265 (La.1987). However, when, as here, the comments do not render the jury's sentencing recommendation unreliable, they do not constitute reversible error. Id. Although these unobjected-to references were improper, their limited nature convinces us they did not render the jury's sentencing recommendation unreliable. Consequently, we find no reversible error in this portion of the state's argument.
Finally, defendant complains of the prosecution's argument that her death by lethal injection would be "a lot more pleasant" than the deaths of the victims, because "all they're going to do is put her on a little slab of table and they're going to give her a shot and then she's going to go gently to sleep." Defense counsel failed to object to this portion of the state's argument. Nevertheless, again, even assuming impropriety of the prosecutor's statement, it did not render the jury's sentencing recommendation unreliable or create a substantial risk that the death penalty would be imposed under influence of passion, prejudice, or other arbitrary factors. See e.g. State v. Mitchell 94-2078, pp. 11-12 (La.5/21/96), 674 So.2d 250, 257-58 (La.1996)(argument by prosecutor requesting jurors to impose "same penalty" that defendant imposed on victim "although in a much nicer manner," not reversible error.).
On the whole, defendant cannot show that any of these arguments injected an arbitrary factor, worthy of reversal, into the sentencing phase, given this court's admonition that reviewing courts must accord "[c]redit . . . to the good sense and fair-mindedness of jurors who have heard the evidence," Jarman, 445 So.2d 1184, 1188 (La.1984). Accordingly, these assignments of error lack merit.
In her twenty-eighth assignment of error, defendant claims the state's closing argument at the penalty phase "impermissibly lessened the juror's awesome sense of responsibility." While this assignment of error is unargued and no specific portion of the state's argument is pointed out, the foregoing discussion thoroughly examines the state's closing argument at the penalty phase. We cannot say we are thoroughly convinced that any improper argument influenced the jury and contributed *746 to the verdict. Accordingly, this assignment of error is also without merit.

CAPITAL SENTENCE REVIEW
Under La.C.Cr.P. art. 905.9 and La.S.Ct.R. 28, this court reviews every sentence of death imposed by the courts of this state to determine if it is constitutionally excessive. In making this determination, the court considers whether the jury imposed the sentence under the influence of passion, prejudice or other arbitrary factors; whether the evidence supports the jury's findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender. In the instant case, the trial court has submitted a Uniform Capital Sentence Report ("UCSR"), and the Department of Public Safety and Corrections ("DOC") has submitted a Capital Sentence Investigation Report ("CSI"). In addition, the state submitted a Sentence Review memorandum.
The CSI indicates that defendant is an African-American female born on March 30, 1971. She was 24 years old at the time of the offense. Born in Opelousas, Louisiana, she was raised there by her natural parents, Adam and Mary Ann Frank. At the time the CSI was prepared, defendant had three male siblings, ages 8, 18, and 25. The two youngest children still resided with her mother in Opelousas and she had had no recent contact with her eldest brother. Defendant claimed to have graduated from Opelousas Senior High School in 1989 with a 3.5 grade point average. However, the DOC was unable to verify this information because defendant refused to sign a release form and the school would not provide any information without one. The DOC investigator could not find any juvenile record for defendant. According to the CSI, defendant claimed that her family moved to New Orleans when she was 18 years old and later moved back to Opelousas. She refused to give any other information about her family except to say that her parents were separated and her father was now living in Houston, Texas. In addition, the defendant claimed to have been a member of the Opelousas Police department Explorer Program; however, the Opelousas Police Department and St. Landry Parish Sheriff's Office have no record of the defendant's participation. Officer Glen Tate, in charge of the NOPD Explorer Scout Program verified that defendant took part in the program and could recall no problems associated with her participation.
The defendant was employed by Wal-mart in Opelousas as a cashier and counter person from June 3, 1988 to December 21, 1988. Defendant's employment was terminated due to frequent personality conflicts with her fellow employees. Sometime after her discharge, defendant was hired by the Wal-mart Store located at 6901 Bundy Road, New Orleans, Louisiana. She claimed that she was hired as an Office Manager. However, the DOC investigator contacted the defendant's former manager who indicated that she was a pricer and not an officer manager. He stated that defendant was a good employee, who kept to herself, and appeared to get along with the other employees. He also related an incident in which the defendant made a complaint of sexual harassment against himself and another manager, Rodney Brown, to the district manager. He said that the defendant claimed the men "looked at her in a sexual way." The three of them met with the District manager and the complaint went no further. Defendant told the investigator that she resigned from Wal-mart after being hired by the New Orleans Police Department. However, a missing persons report filed by her father indicates that she was unemployed *747 prior to being hired by the NOPD. Defendant was hired by the NOPD on February 7, 1993. She graduated from the Police Academy on February 28, 1993. According to the NOPD July 12, 1992 pre-employment psychological report, defendant scored below average with regard to tolerance, impulse control, maturity and probable adjustment to organization. The report also suggested, "a hint of rebelliousness, problems with authority and marked assertiveness." The report indicated that a psychiatric evaluation was in order. On September 1, 1992 Dr. Philip Scurria examined the defendant and found her unsuitable for the job of police officer. The DOC investigator contacted Dr. Scurria and he indicated that the defendant's unsatisfactory rating was due mainly to her misrepresentation of the truth. He stated that he found no evidence of psychosis, only unacceptable personality traits for a police officer. The defendant requested a second opinion and on October 9, 1992 an evaluation was conducted be Dr. Dennis E. Franklin. He found some of the same traits as Dr. Scurria, but placed more weight on the defendant's letters of recommendation and did not feel that the traits were enough to preclude her acceptance to the police department.
Shortly after graduating from the police academy, the defendant was assigned to the Seventh Police District. Her platoon commander stated that she was accommodating and would try to do anything asked of her. According to him, she seemed to get on well with her fellow officers but her skills as a police officer were limited to very basic assignments. She had problems with any assignment of an intricate nature. During her first six to eight months defendant rode with a partner. After her partner was transferred, she was assigned to a "one-man" car. In addition, the DOC investigator contacted the personnel manager at Dillard's Department store, Lake Forest. She verified that defendant worked security from September 22, 1994 until her arrest. She could not provide any other information due to store policy. The investigator also confirmed defendant's sporadic enrollment at Delgado Community College up until the time of her arrest. CSI at 9.
The defendant and one of the victims, Officer Ronald Williams, were never partners, although they may have ridden together on occasion. The two did become friends and she often filled in for him on his permanent detail at the Kim Anh Restaurant. According to her statement, given the night of the murders, she often filled in for him if he was sick or tired and sometimes just went to the restaurant to hang out with him.
On November 25, 1994, defendant handled a shooting incident in which Rogers Lacaze was one of the victims. The DOC investigator believes this was the first contact between the two, although in her statement, she claims that they met some eight months before the murder. The association between them became close and constant. Other police officers witnessed Lacaze driving her car and even observed him moving her police unit at the scene of an accident she was investigating. On one occasion, Lacaze accompanied her on a complaint call and she introduced him as a "trainee." There were other times when Lacaze was introduced as her nephew. The defendant refused to discuss her relationship with Lacaze during the DOC investigation, except to say that she was trying to help him. When asked why she would continue the relationship knowing that Lacaze had been involved in dealing drugs and in a shooting, she claimed that she would not disassociate herself from him just because of his past. The investigator also questioned the defendant about trying to buy 9mm ammunition for Lacaze *748 at Wal-mart on the day before the murders. She stated that she was a police officer and that there was nothing wrong with her buying ammunition. According to her statement, she claimed that she and Lacaze were not dating and had never been intimate. Defendant refused to discuss anything regarding Officer Williams, the Vus or the murders. Every time the investigator asked her a question, she told him to "look it up in the record," and asserted her innocence. However, during her interview with the DOC investigator, defendant did claim to have had a male suitor, but refused to go into specifics because he works for the police department.
The investigator also attempted to contact defendant's mother, but she too refused to speak with him. She indicated that she was tired of everyone calling her house and she had nothing more to say. Notably, defendant's brother, Adam Frank, Jr. is currently on probation from St. Landry Parish for two counts of simple burglary. He absconded from probation supervision and on September 16, 1992, a warrant was issued for his arrest which remained in effect at the date of the report. Defendant's father was arrested in New Orleans in 1981 and charged with Battery and Firing Certain Weapons. Both charges were dismissed in 1992.
The USCR indicates that the defendant refused to be examined by court appointed psychologists on two occasions. The report also indicates that the three victims were killed during the commission of an armed robbery, that one of the victims, Ronald Williams, was a New Orleans Police officer, and that another victim, Quoc Vu, was pistol whipped before his death. The report notes that the defendant was friends with all three victims. Finally, the trial judge states in the USCR that, "The defendant was a New Orleans Police Officer and, as such, owed a duty to protect and serve the community. The defendant violated her oath of office in committing these acts. It is the opinion of this Court that the sentence here is appropriate considering the facts and circumstances of this case."
As to each of the counts of first degree murder, the state presented two aggravating circumstances, and as to the murder of Officer Williams, three aggravating circumstances, under La.C.Cr.P. art. 905.4(A), and the jury returned death verdicts, agreeing that all three were supported by the evidence: (1) the offender was engaged in the perpetration of an armed robbery; (4) the offender knowingly created a risk of death or great bodily harm to more than one person; and (2) as to Officer Williams, the victim was a peace officer engaged in the lawful performance of his duties.
At the penalty phase, the state presented brief victim-impact testimony from Nguyet Vu, Cuong Vu and Ha Vu's mother and Mary Williams, Ronald Williams wife. The defendant did not testify at either phase of her capital trial. The defense presented four witnesses at the penalty phase, including Irvin Bryant, a witness to the defendant's false imprisonment and battery on Anthony Wallace; Captain John Landry of the NOPD, a witness who testified that defendant had been selected as an "officer of the month" by the Kiwanis Club; Mable Geniesse, defendant's aunt; Helen Adams, defendant's grandmother; and Mary Ann Frank, defendant's mother. In mitigation, the defense argued that defendant had no significant criminal history; that the offense was committed while defendant as under the influence of extreme mental or emotional distress; that the defendant was a young offender under the influence or domination of another; and that she was a principal whose participation *749 was relatively minor. La.C.Cr.P. art. 905.5.
PASSION, PREJUDICE, AND ARBITRARY FACTORS
Defendant contends that the murders transformed the city of New Orleans, raising a hue and cry from all quarters. In this atmosphere of public hysteria, defendant claims her capital jury was selected. However, this assignment of error is fully treated in this court's original opinion. Defendant further argues that the error was compounded by the prosecutors' arguments inviting the jury to turn her trial into a plebiscite on crime. This argument is treated fully in this court's original opinion. Defendant further claims that the trial court erroneously admitted other crimes evidence in her penalty phase and that this error injected prejudice in the penalty phase. These arguments were fully addressed above, and found to lack merit. None of the arguments herein warrant reversal.
AGGRAVATING CIRCUMSTANCES
Defendant was indicted by grand jury and charged with committing three counts of first degree murder, the indictment listed the following aggravating circumstances to be relied upon at the sentencing hearing: (1) defendant was engaged in the perpetration or attempted perpetration of an armed robbery, La.C.Cr.P. art. 905.4(A)(1); (2) defendant knowingly created a risk of death or great bodily harm to more than one person, La.C.Cr.P. art. 905.4(A)(4); and with respect to victim Ronald Williams, (3) the victim was a peace officer engaged in his lawful duties. La.C.Cr.P. art. 905.4(A)(2). The jury returned its death verdict on all three counts of first degree murder after finding that the evidence supported all three aggravating circumstances urged by the state. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
PROPORTIONALITY REVIEW
Although the federal Constitution does not require proportionality review, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Burrell, 561 So.2d 692, 710 (La.1990); State v. Wille, 559 So.2d 1321 (La.1990); State v. Thompson, 516 So.2d 349 (La. 1987). This court, however, has set aside only one death penalty as disproportionately excessive under the post-1976 statutes, finding in that one case, inter alia, a sufficiently "large number of persuasive mitigating factors." State v. Sonnier, 380 So.2d 1, 9 (La.1979); see also State v. Weiland, 505 So.2d 702, 707-10 (La.1987) (in case reversed on other grounds, dictum suggesting that death penalty disproportionate).
This court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury's recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises. Sonnier, supra.
The state's Sentence Review Memorandum reveals that since 1976, 376 cases have originated as first degree murder charges in Orleans Parish, and of those, juries have recommended imposition of the death penalty 37 times, including the instant case. Of those 37 cases in which the juries recommended death, 30 of those juries found at least one of the three aggravating circumstances found by the defendant's jury. Twenty-two of these cases involved homicides committed during the commission of an armed robbery, six involved at least the aggravating circumstance *750 that the offender created a risk of death to more than one person, and nine of the cases involved the two combined circumstances that the offender was engaged in, an armed robbery giving rise to a risk of death to more than one person. The following cases involved a killing during the course of an armed robbery: State v. Ronald Monroe, 366 So.2d 1345 (La. 1978)(rev'd); State v. Gerald Parker, 372 So.2d 1037 (La.1979) (rev'd), 421 So.2d 834 (La.1982) (second degree); State v. Norton Hamilton, 478 So.2d 123 (La.1985)(rev'd); State v. Antonio James, 431 So.2d 399 (La.1983)(aff'd); State v. Don M. Jordan, 420 So.2d 420 (La.1982)(rev'd); State v. Joseph Marshall, 414 So.2d 684 (La.1982); State v. Joe Brown, 414 So.2d 689 (La. 1982)(rev'd); State v. Howard Mattheson, 407 So.2d 1150 (La.1981)(aff'd); State v. Curtis Kyles, 513 So.2d 265 (La. 1987)(rev'd), Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); State v. John Thompson, 516 So.2d 349 (La.1987) (aff'd); State v. John Brown, Jr., 514 So.2d 99 (La.1987) (aff'd); State v. Keith Messiah, 538 So.2d 175 (La. 1988)(aff'd) (retrial of penalty phase granted, defendant and state waived penalty hearing and defendant sentenced to life); State v. John Sullivan, 596 So.2d 177 (La. 1992)(rev'd); State v. Tommy Cage, 554 So.2d 39 (La.1990)(aff'd), on remand from U.S. Supreme Court, 583 So.2d 1125 (La. 1991) (aff'd); 667 So.2d 519 (La.1996) (sentenced to life imprisonment after retrial in Sept. 1997); State v. Norvell Smith, 554 So.2d 676 (La.1989)(rev'd); State v. John Brooks, 92-3331 (La.1/17/95), 648 So.2d 366 (rev'd); State v. Marcus Hamilton, 92-1919 (La.9/5/96), 681 So.2d 1217(aff'd); State v. Derek Landry, 97-0499 (La.6/29/99), 751 So.2d 214 (rev'd); State v. Rogers LaCaze, 99-0584 (La.1/25/02), 824 So.2d 1063 (aff'd); State v. Shareef Cousin, 96-2973 (La.4/14/98), 710 So.2d 1065 (rev'd); State v. Juan Smith, 98-1417 (La.6/29/01), 793 So.2d 1199 (aff'd); State v. Phillip Anthony, 98-0406 (La.4/11/00), 776 So.2d 376 (aff'd). Whether a search is limited to Orleans Parish or conducted on a state-wide basis, this court has consistently affirmed capital sentences for murders committed during armed robberies. See e.g., State v. Davis, 92-1623 (La.5/23/94), 637 So.2d 1012, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 357, reh'g. denied, 513 U.S. 1066, 115 S.Ct. 687, 130 L.Ed.2d 617 (1994) (Caddo Parish); State v. Busby, 464 So.2d 262 (La. 1985), cert. denied, 474 U.S. 873, 106 S.Ct. 196, 88 L.Ed.2d 165 (1985), sentence vacated, 538 So.2d 164 (La.1988)(Vernon Parish); State v. Knighton, 436 So.2d 1141 (La.1983), cert. denied, 465 U.S. 1051, 104 S.Ct. 1330, 79 L.Ed.2d 725 (1984)(Bossier Parish); State v. Taylor, 422 So.2d 109 (La.1982), cert. denied, 460 U.S. 1103, 103 S.Ct. 1803, 76 L.Ed.2d 367 (1983) (Jefferson Parish); State v. Lindsey, 543 So.2d 886 (La.1989), cert. denied, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990)(Jefferson Parish).
In addition, two of these cases mirror the facts of the instant case, in which restaurant employees were corralled into a cooler and executed. Like the instant case, in those cases, the state relied on the combined aggravating circumstances that an armed robbery had claimed more than one life or created a risk of death to more than one person. La.C.Cr.P. art. 905.4(1) and (4). In State v. Tyler, 97-0338 (La.9/9/98) 723 So.2d 939, a Caddo Parish jury determined that defendant should be sentenced to death after he entered a Pizza Hut armed with a .22 caliber revolver, ordered the three employees to lie face down on the floor in the cooler after robbing them and shot each one in the back of the head. One employee was killed, and two employees survived without permanent physical injury. In State v. Philip *751 Anthony, supra, an Orleans Parish jury determined that the defendant should be sentenced to death after he, along with his two co-perpetrators, entered the French Quarter Louisiana Pizza Kitchen, ordered four employees to the cooler where he placed a potato on the gun (in an attempt to muffle the sounds) and shot each of the victims. Two of the victims were killed, and one survived.
Considering the foregoing, the death sentence imposed in this case does not appear disproportionate. Evidence at trial established the cold-blooded and callous disregard for human life exhibited in these killings. Nothing contained in the post trial documents filed pursuant to La. S.Ct.R. 28 warrants reversal of Defendant's death sentence.

DECREE
Defendant's conviction was previously affirmed. State v. Frank, 99-0553 (La.1/17/01), 803 So.2d 1. For the reasons assigned herein, defendant's sentence is affirmed. In the event this judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies her petition for certiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules for rehearing of denial of certiorari, or (b) that Court denies her petition for rehearing, the trial judge shall, upon receiving notice from this court under LSA-C.Cr.P. art. 923 of finality on direct appeal, and before signing the warrant of execution, as provided by LSA-R.S. 15:567(B), immediately notify the Louisiana Indigent Defense Assistance board and provide the Board with reasonable time in which: (1) to enroll counsel to represent the defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under LSA-R.S. 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed, in the state courts.
CALOGERO, C.J., dissents and assigns reasons.
JOHNSON, J., dissents for reasons assigned by CALOGERO, C.J.
CALOGERO, Chief Justice, dissents and assigns reasons.
I respectfully dissent from the majority opinion today. In my view, the district court abused its discretion in finding that the defendant failed to make the requisite showing of need under State v. Touchet, 93-2839 (La.9/6/94), 642 So.2d 1213. The district court, therefore, erred in failing to order the defendant a new sentencing hearing. Because I believe the district court's failure to order a new sentencing hearing obviously prejudiced the defendant by denying her critical expert assistance during the penalty phase of her capital trial, I would vacate the sentence and remand the matter for a new sentencing hearing.
In State v. Frank, 99-0553 (La.1/17/01), 803 So.2d 1 (Frank I), we affirmed the defendant's conviction for first degree murder in violation of La.Rev.Stat. 14:30. However, we found that the district court had erred in determining before trial that the defendant was not indigent and, therefore, not entitled to state-funded psychiatric and mitigation expert assistance. We thus recognized in Frank I that the district court's erroneous ruling effectively denied the defendant her opportunity, pursuant to Touchet, 93-2839, 642 So.2d at 1216, to show a reasonable probability that a state-funded psychiatrist and mitigation expert would be of assistance to the defense and that the denial of funds for *752 expert mitigation assistance would deprive the defendant of a fundamentally fair sentencing hearing. Frank I, 99-0553, p. 10, 803 So.2d at 11. Accordingly, we remanded the case to the district court and ordered an evidentiary hearing after which the district court, pursuant to Touchet, was to determine whether the defendant could establish, with a reasonable degree of specificity, that expert mitigation assistance is necessary to answer a substantial issue or question that is raised by the prosecution's case or to support a critical element of the defense. Touchet, 642 So.2d at 1216. If the defendant could make such a showing, the district court was to order a new penalty hearing and to order that state funds be procured so that the defendant may hire the requested experts to assist her defense at the sentencing hearing. Frank I, p. 10, 830 So.2d at 11.
The district court on remand narrowly found that the defendant was not entitled to state-funded mitigation assistance because she would have refused to be interviewed by any state-funded mental health expert and, therefore, she was not prejudiced by the denial of state funds. The majority in my view errs in clutching at the district court's strained, and perhaps bitter, rationale and then concluding the defendant was therefore not prejudiced by the district court's pre-trial rulingfound to be error in Frank Idenying the defendant her request to be deemed indigent and to be provided funds to develop and present mitigation evidence.[1]
I believe there are a number of failings in the majority's reasoning, which I discuss in more detail below. First, although the majority recites the Touchet standard, it ignores the fact that the district court did not apply the Touchet standard as it was directed to do on remand. Second, the majority ignores the fact that defense counsel asked not only for the assistance of a psychiatric or psychological expert, but he also asked for the assistance of a social worker or mitigation expert. Third, the majority ignores the fact that the state in the penalty phase raised the issue of the defendant's lack of mental illness, an issue to which the defendant was denied the ability to respond when the district court erroneously refused to find her indigent. These omissions, in my view, compromise the majority's conclusion that the defendant was not prejudiced by the district court's error.
The state's case at the penalty phase of the trial consisted mainly of the testimony of Dr. Philip Scurria, a psychiatrist who screened applicants to the police academy on behalf of the New Orleans Police Department. Dr. Scurria's testimony in the penalty phase was extensive, and pertained to the defendant's background investigation, four psychological and psychiatric examinations, and two personality tests, the Minnesota Multi-Phasic Personality Inventory (MMPI) and the California Personality Inventory (CPI), all conducted at the age of 20, when she applied for admission to the police academy. Dr. Scurria explained at length the findings of the other psychologists and psychiatrists, *753 as well as his own. Essentially, he concluded the defendant exhibited some level of psycho-pathology, which the state argued to the jury established that she was "a pathological liar." Asked his opinion regarding whether the defendant suffered from an extreme mental or emotional disorder. Dr. Scurria responded, "I saw no evidence from the information in any of those reports or my evaluation that she suffered from any major psychiatric disorder." Although Dr. Scurria admitted on cross-examination that he had never made a diagnosis on the defendant, because his only task had been to evaluate her as to her suitability to enter the police academy, not to diagnose her with or without a mental illness, he testified on redirect examination that the defendant did not appear to have any extreme mental or emotional disturbances.
The defense had very little in the way of a response, hampered as it was by the district court's denial of state-funded psychiatric and mitigation expert assistance to help the defendant prepare for the sentencing phase of trial and to present mitigating circumstances in her background as a basis for a sentence less than death. The defense thus introduced no psychological or psychiatric testimony to respond to or explain Dr. Scurria's lengthy testimony regarding her level of psycho-pathology and the absence of mental illness or defect.
The district court on remand held that, had the defendant been granted expert assistance, she would have refused to meet with her psychiatrist or psychologist or other mental health expert. The majority today goes one step further and concludes the defendant was in fact afforded expert mitigation assistance but declined it. I simply cannot agree with either conclusion.
In our original opinion, we rejected the state's argument that the defendant's refusal to cooperate with a court-appointed psychiatrist for the purpose of determining whether she was competent to stand trial, when she testified for the record that she believed she was competent, meant that she would not cooperate with any other evaluation for purposes of presenting mitigating evidence. Frank I, p. 9 n. 5, 803 So.2d at 4 n. 5. Despite that caution, the district court erred in relying on the defendant's refusal to meet with the psychiatrists appointed to determine her competency as support for the factual conclusion that she would have also refused to cooperate with a defense-approved mitigation expert.
As to the defendant's refusal to meet with Dr. Zimmerman, trial counsel testified the defendant had told him she did not want to speak with any mental health experts outside of his presence. Dr. Zimmerman testified that it was fairly common for an accused to refuse to speak to him upon an initial meeting, and that the accused would then willingly submit to the interview after the accused's counsel had explained the doctor's presence and purpose. Here, though Dr. Zimmerman did inform trial counsel that the defendant had initially declined to see him for mitigation purposes, counsel never went back to the defendant either to tell her she could and should submit to an interview by Dr. Zimmerman or to be present during such an interview. Thus, although the defendant may have understood Dr. Zimmerman's explanation regarding his purpose for examining her, as Dr. Zimmerman testified, the evidence shows that she had asked that her counsel be present during any interview with a mental health expert. The record thus reveals that the defendant was merely consistent in her refusal to submit to a mental health evaluation in the absence of her counsel, and that counsel, for whatever reason, did not give her his timely approval to speak with Dr. Zimmerman *754 or did not make himself available to be present during such an interview.[2] Thus, I disagree with the majority's premise that the defendant was actually afforded mitigation assistance and knowingly declined such assistance.
More pertinently, the trial court failed to make a determination under Touchet as directed by this court in our original opinion. Notably, because the trial court became focused on whether or not the defendant would have met with a psychiatrist or psychologist, the court made no finding with regard to the necessity of a social worker or mitigation expert, which was also requested by the defense prior to trial. A mitigation expert is "an expert (usually a social worker) who assists in the investigation, preparation, and presentation of relevant mitigation evidence for the penalty phase of trial." State v. Craig, 93-2515, p. 2 n. 2 (La.5/23/94), 637 So.2d 437, 445 n. 2.
In the instant case, there can be no doubt that state-funded expert mitigation assistance was clearly requested and reasonably specified by the defense in an ex parte motion as the assistance of a mental health professional and a social worker or mitigation investigator, see Frank I, p. 9, 830 So.2d at 10, and that this assistance was necessary to "answer a substantial issue or question raised by the prosecution's case or to support a critical element of the defense." Touchet, 642 So.2d at 1216. A capital sentencing hearing, the legislature has determined, "shall focus on the circumstances of the offense, the character and propensities of the offender, and the victim, and the impact that the crime has had on the victim, family members, friends, and associates." La.Code Crim. Proc. art. 905.2(A). In light of the focus on the offender's "character and propensities," the legislature has further mandated that the jury consider certain mitigating circumstances before deciding to impose death, including whether, "at the time of the offense, the capacity of the offender to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect. . . ." Because the legislature has specified that the jury before imposing a sentence of death consider the offender's mental disease or defect, if any, at the time of the offense, the question of the defendant's mental health is clearly a "substantial" issue, as well as a critical element of the defense, during a capital sentencing hearing.
The state in the instant case certainly made the offender's alleged lack of mental disease or defect at the time of the offense a central thrust of its case-in-chief during the penalty phase, as evidence by the testimony and opinions of Dr. Scurria. His testimony on direct examination during the penalty phase culminated with his opinion as a psychiatrist that he saw no evidence, either in any of the reports from Drs. Drolley, Franklin, or Barnes, or in his evaluation of the defendant, "that she suffered from any major psychiatric disorder." On re-direct examination, Dr. Scurria reiterated that the defendant did not appear to have any extreme mental or emotional disturbances. In closing argument, the state referenced Dr. Scurria's expert testimony when it asserted to the jury that the defendant was simply "a pathological liar," as her pre-academy psychological testing showed, and that there was no mitigating circumstance to consider because she did not suffer from a mental disease or defect, as the psychiatrist had *755 testified "there was nothing wrong with her." Therefore, not only was the defendant's mental and emotional health a statutorily-mandated focus of the sentencing hearing to be considered by the jury, and thus a critical element of the defense, the state made the defendant's alleged lack of mental disease or defect at the time of the offense a "substantial issue or question" in its case-in-chief for a sentence of death.
Given that the issue or question of the defendant's mental health at the time of the offense was both a statutorily-mandated focus of the sentencing hearing and a central part of the state's case for the death penalty, the district court was required under Touchet to determine whether the expert assistance specified by the defense, namely the services of a psychiatrist and a social worker or mitigation investigator, was reasonably necessary to answer the "substantial" question raised both by statute and the state, that is, the defendant's mental health at the time of the offense. In this regard, the testimony on remand supports a finding that expert assistance to develop mitigation evidence was reasonably necessary to answer a substantial issue or question raised by the prosecution or a critical element of the defense. Dr. Deland testified that when she is called upon to assist the defense in a capital case, the referral question presented to her is essentially whether, from her expert experience and education, she could testify about any mental health issues of the defendant that would affect her behavior, functioning, or development. To answer this question, she requests (1) a psycho-social history and background history to be gathered by a social worker or mitigation expert; (2) all pertinent medical records that are involved both of the defendant and any indicated family members; (3) several personal interviews with the defendant; and (4) any necessary psychological and neurological testing to be performed by other experts. Because that information has not yet been gathered in this case, Dr. Deland could not give a definitive opinion on the defendant's mental health. However, she did testify that the defendant had related facts regarding physical, mental, and sexual abuse she experienced at the hands of her father. She testified that there were indicators of post-traumatic stress disorder (PTSD), a serious mental health defect, and that such could have affected the defendant's behavior. Dr. Deland also testified as to the chemical changes possible in the brain as the result of growing up in a household with a parent who is mentally ill, and the defendant's history suggested that her father may have suffered from PTSD, possibly as the result of his service in Vietnam. The witness thus testified there existed evidence of mitigating circumstances that could have been considered by the jury. See Abdul-Kabir v. Quarterman, 550 U.S. ___, ___, 127 S.Ct. 1654, 1673, 167 L.Ed.2d 585, ___ (2007) (recognizing that "possible neurological damage" is relevant mitigating evidence).
The testimony of Drs. Salcedo, Turin, and Richoux, the experts appointed by the court, generally supported Dr. Deland's assertion that further evaluation of the defendant and her psycho-social history, especially her report of abuse, was warranted. They also agreed that a mental health expert could have aided the defense in responding to the state's case. Dr. Seiden, the state's expert, though he cited indicators that might belie the defendant's report of sexual abuse, nonetheless testified that further corroboration of the defendant's history would be necessary and that a mental health expert could have assisted the defense in responding to the state's case and in preparing mitigation evidence. Finally, Mr. Boren testified as to the assistance a mitigation expert could have provided defense counsel in the defendant's capital sentencing hearing.
*756 The question before the district court on remand was whether the defendant had met her burden of showing, with reasonable specificity, that expert assistance was necessary to answer a substantial issue raised by the prosecution or a critical element of the defense. I believe the defendant made that showing in this case. Cf. Craig, (upholding court-ordered payment of an investigator, a psychologist and a mitigation expert); State v. Langlois, 605 So.2d 1155 (La.1992) (ordering payment of $5,000 in court and/or state funds for hiring of defense mitigation experts).
Although the majority concludes the defendant refused the assistance of a mitigation expert, this is not a case, like that recently decided by the United States Supreme Court, in which the defendant has specifically disallowed his counsel to present mitigating evidence. See Schriro v. Landrigan, 550 U.S. ___, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007)(court narrowly reversed grant of post-conviction relief on the basis that the accused had steadfastly refused to allow his counsel to present the testimony of his ex-wife and birth mother at the sentencing hearing as mitigating evidence and also interrupted counsel when he tried to proffer such evidence). And even if the defendant had knowingly and intelligently refused to assist in the development of her mitigation case, defense counsel has a duty to investigate possible mitigating evidence, see Rompilla v. Beard, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), so surely an indigent's counsel should be afforded the necessary means to conduct such an investigation. Accordingly, this case is one in which the district court erroneously refused to find the defendant indigent and to provide the defense with requested state-funded expert mitigation assistance, thereby precluding counsel from conducting a constitutionally adequate investigation for possible mitigating evidence. Cf. Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). Thus, in my view the defendant has been denied her right as a capital defendant to have the sentencing decision reflect meaningful consideration of all relevant mitigating evidence. See, e.g., Abdul-Kabir v. Quarterman, 550 U.S. at ___, 127 S.Ct. at 1675, 167 L.Ed.2d 585 ("[W[hen the jury is not permitted to give meaningful effect or a "reasoned moral response" to a defendant's mitigating evidence, . . . the sentencing process is fatally flawed.]"); Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).
The end result of the trial court's erroneous rulings on the defendant's indigent status and her need for expert mitigation assistance is that the defendant proceeded before a jury in a capital sentencing hearing with no mitigation expert and no mental health expert. The majority's conclusion to the contrary, and notwithstanding the evidence of the defendant's guilt, I believe the absence of mitigation expert assistance prejudiced the defendant in this case and that the sentencing process was fatally flawed. The Supreme Court and this court have repeatedly stressed that a capital defendant has an absolute right under the Eighth Amendment to introduce virtually any evidence in mitigation at the penalty phase of a capital trial. Such evidence includes "any aspect of a defendant's character or record and any of the circumstances of the offence that the defendant proffers as a basis for a sentence less than death." Lockett, 438 U.S. at 604, 98 S.Ct. 2954. The nature of the penalty phase at a capital trial, which requires a unanimous verdict from twelve jurors to return a sentence of death, underscores the importance of these jurors receiving adequate and accurate information regarding the character and propensities of the defendant. "Without such information, a jury cannot make the life or death decision in a rational and individualized manner." State ex rel. *757 Busby v. Butler, 538 So.2d 164, 169 (La. 1988). A sentence of life will be imposed if only a single juror is convinced that a sentence less than death is warranted. Thus, mitigation evidence bearing on the "life or death" sentencing decision is of necessity crucial, and the erroneous exclusion of such evidence will result in reversal of the conviction and sentence. Skipper v. South Carolina, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986); State v. Weiland, 505 So.2d 702, 706-07 (La.1987). Here, the trial court's ruling similarly denied the defendant the ability to investigate and present necessary and relevant mitigating evidence in the penalty phase and, therefore, denied the defendant a fair sentencing hearing.
For the reasons set forth above, I believe the district court abused its discretion in finding that the defendant failed to make the requisite showing of need for expert mitigation assistance under Touchet and, therefore, the district court erred in failing to order the defendant a new sentencing hearing. Because I believe that the district court's error prejudiced the defendant in the sentencing phase of the trial, I would reverse the district court's ruling, vacate the sentence of death, and remand the matter for a new sentencing hearing.
NOTES
[1] The state and defense also stipulated that, on defendant's recommendation, Judge Dennis Waldron several months prior to the murders had given Cuong Vu a recognizance bond following Cuong's arrest for illegally discharging a weapon in his backyard.
[2] Although the doctors were generally satisfied that their interview with defendant was adequate to respond to the district court's concerns, they all agreed that it would have been helpful if defendant had talked about the circumstances of the crime to give them some idea of how she perceived her own conduct. However, defendant informed them that her attorneys had instructed her not to talk about the offense.
[3] Defendant argues that Dr. Zimmerman's testimony was privileged because the psychologist "was asked as a defense expert to see Ms. Frank. It offends the constitution to put him on the stand and compel his testimony about what she said to him, just as it would if the state called her investigator or her lawyer to the stand." First, Dr. Zimmerman made clear in his testimony that the problem he had with defendant during the interview is that she would not speak to him. In addition, the record offers no suggestion that Dr. Zimmerman was "compelled" to testify, although the circumstances in which the state discovered his role in the case and called him as a witness remain unclear. The only evidence on that issue was the witness's statement that he did not call the state but that Roger Jordan called him "and asked me, and I said that his information was correct[.]" To the extent that Dr. Zimmerman made clear to defendant that the purpose of his visit was not to determine her competency to stand trial but to develop any mitigating circumstances in her background, any statements made by defendant do not appear to have implicated the health care provider-patient privilege in La. C.E. art. 510(C)(1), which protects confidential communications "made for the purpose of advice, diagnosis or treatment of [the patient's] health condition between or among himself, his representative, and his physician or psychotherapist, and their representatives." While defendant argues her refusal to cooperate was itself privileged, that statement by defendant to Dr. Zimmerman did not implicate any privilege under La. C.E. art. 510(C)(1) because it did not concern any aspect of her health condition. The statement would also not constitute a confidential communication to an attorney or his representative for purposes of the lawyer-client privilege in La. C.E. art. 506 because defendant's refusal was not made "for the purpose of facilitating the rendition of professional legal services to the client," La. C.E. art. 506(B), but for the purpose of frustrating those services.
[4] Specifically, the record reveals the following testimony:

Defense counsel: She declined your representation as a mitigation expert for the penalty phase, is that correct?
Dr. Zimmerman: Yes.
Defense counsel: And doctor, this was pre-trial, is that correct?
Dr. Zimmerman: That's correct.
[5] At a hearing conducted on August 30, 1995, the following testimony was given by the court-appointed psychiatrist, Dr. Ritter:

Assistant District Attorney ("ADA"): [D]id you attempt to examine Ms. Frank?
Dr. Ritter: On two occasions.
ADA: And, was Ms. Frank cooperative in allowing you to ask questions or to examine her to evaluate her for the purpose of Trial and/or competency?
Dr. Ritter: No, she was not. The first time I tried to examine her, she said she wanted her attorney present. So, I discontinued. I just identified her and I left and I guess we found Mr. Jenkins and he came and I thought we were going to proceed with the examination. And, when I went back in the office to examine her, she said "what are you here for" and I told her to make a mental evaluation and she said "very well. I refuse. I don't know what my attorney had in mind."
After Dr. Ritter stepped down from the witness stand, the following exchange ensued:
ADA: And, Judge, just for the record, to perfect the record. Mr. Jenkins being here, Mr. Larre being here [defendant's attorneys], I would ask the Court one more time to ask Ms. Frank does she want to be examined or does she not want to be examined.
Court: Ms. Frank, do you want to be examined?
Defendant: No, sir, I do not.
Court: Can you tell me the reason why?
Defendant: Exactly what you said. I testified yesterday and answered your questions appropriately. I don't need to have a lunacy hearing.
[6] The assignments of error not discussed in this opinion do not constitute reversible error and are governed by well-settled principles of law. Those assignments are reviewed in an unpublished appendix that will comprise a part of the official record in this case.
[7] La. C.E. art. 705(B), entitled "Disclosure of facts of date underlying expert opinion; foundation," provides:

B. Criminal cases. In a criminal case, every expert witness must state the facts upon which his opinion is based, provided, however, that with respect to evidence which would otherwise be inadmissible such basis shall only be elicited on cross-examination.
[8] In State v. Wessinger, 98-1234, pp. 27-28 (La.5/14/99), 736 So.2d 162, 181, this Court ended the exemption of sentencing hearings in capital cases from the contemporaneous objection requirement of La.C.Cr.P. art. 841. Nevertheless, fully aware "that this holding affects the meting out of the most serious sanctions our society can impose," the court explicitly made the contemporaneous objection rule applicable only "to the penalty phase of those trials that begin after this decision is rendered." Thus, because this ruling in Wessinger was made to apply prospectively only, we will review even unobjected-to penalty phase allegations of error in this 1995 trial.
[1] The record on remand indicates that, even after our decision in Frank I that the trial court had erred in refusing to declare the defendant indigent for purposes of obtaining state-funded expert mitigation assistance, the trial court still believed the defendant had possessed sufficient financial resources prior to trial to hire any experts that she needed. The trial court also appeared to take issue with trial counsel's motivation for taking on the case, because he was initially paid by the defendant's family and then wanted to continue representing the defendant through his position with the Orleans Indigent Defender Program.
[2] The majority's reasoning, in my view, implicitly recognizes trial counsel's ineffective assistance because he never instructed the defendant to speak with Dr. Zimmerman in his absence and/or never made himself available to be present during the interview.