NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2020 KA 0150

STATE OF LOUISIANA

VERSUS

DARRELL T. BROWN, JR

*Judgment Rendered:*   FEB 1 9 2021

********

Appealed from the 19th Judicial District Court
In and for the Parish of East Baton Rouge
State of Louisiana
Suit No. 12-17-0105, Sec. I

The Honorable Fred T. Crifasi, Judge Presiding

********

| | |
|---|---|
| Hillar C. Moore, III<br>District Attorney<br>Stacy L. Wright<br>Baton Rouge, Louisiana | Plaintiff/Appellee<br>State of Louisiana |
| Jane L. Beebe<br>New Orleans, Louisiana | Counsel for Defendant/Appellant<br>Darrell T. Brown |
| Darrell T. Brown<br>Angola, Louisiana | Defendant/Appellant<br>Pro Se |

********

BEFORE: GUIDRY, McCLENDON, AND LANIER, JJ.

**LANIER, J.**

The defendant, Darrell T. Brown, Jr., was charged by grand jury indictment with the following offenses: aggravated incest (victim under the age of thirteen), a violation of La. R.S. 14:78.1(D)(2)[1] (count one); aggravated rape[2] (victim under the age of thirteen), a violation of La. R.S. 14:42(A)(4) (count two); sexual battery (victim under the age of fifteen), a violation of La. R.S. 14:43.1(A)(2) (count three); and molestation of a juvenile (by virtue of a position of control or supervision), a violation of La. R.S. 14:81.2(A)(1) (count four). (R. 23). He pled not guilty on each count. (R. 1). After a trial by jury, he was found guilty as charged on each count.[3] (R. 19, 1238-39). The trial court denied the defendant's combined motion for new trial and post-verdict judgment of acquittal. (R. 20, 421-28, 1245). The trial court sentenced the defendant on count one to twenty-five years imprisonment at hard labor; on count two to life imprisonment at hard labor; and on counts three and four to ten years imprisonment at hard labor. The sentences imposed on counts one, two, and three, are to be served without the benefit of probation, parole, or suspension of sentence. The sentences imposed on counts one, three, and four are to run consecutive to each other and concurrent to the sentence imposed on count two. (R. 20-21, 1252-53).

The defendant now appeals, assigning error in a counseled brief as to count two only, challenging the sufficiency of the evidence to prove the victim was under

---

[1] According to the indictment, the offense on count one, aggravated incest, occurred between the approximate dates of October 26, 2009 and October 24, 2012. We note that in 2014, the Louisiana Legislature repealed La. R.S. 14:78.1 and included its provisions in the amended aggravated crime against nature statute. See La. R.S. 14:89.1(A)(2)(a); 2014 La. Acts, Nos. 177, §2 & 602, §7. Nonetheless, this repeal and amendment does not relieve any person convicted of aggravated incest from any requirement, obligation, or consequence imposed by law resulting from that conviction. See La. R.S. 14:89.1(E).

[2] In 2015, the legislature amended the title of "aggravated rape" to "first degree rape." See 2015 La. Acts, No. 184, § 1 & 2015 La. Acts, No. 256, § 1. Any reference to aggravated rape is the same as a reference to the current crime of first degree rape. See La. R.S. 14:42(E).

[3] The polling of the jury shows that the verdicts on counts one, three, and four were unanimous. However, on count two, eleven of twelve jurors found the defendant guilty as charged. (R. 391-402, 1239).

2

the age of thirteen at the time of the incident and the constitutionality of the verdict based on a jury concurrence of eleven of twelve. The defendant also filed a pro se brief, assigning error as to the sufficiency of the evidence in support of counts one, three, and four, the denial of a motion to continue, and the denial of a motion for mistrial. For the following reasons, on counts one, three, and four, we affirm the convictions and sentences, but on count two, we vacate the conviction and sentence, and remand for a new trial.

## STATEMENT OF FACTS

On August 14, 2017, M.C. and her daughter K.H.[4] came to the Baton Rouge City Police Department (BRPD) headquarters to report a sexual assault and were interviewed by Detective Jon Meliet. (R. 978). Based on their allegations, Detective Meliet developed the defendant (K.H.'s stepfather) as a suspect and learned that the victim made a previous report in 2010 to the Baker Police Department (BPD), which did not result in an arrest of the defendant. (R. 980). After learning that the defendant attempted to contact the victim while he was interviewing her, Detective Meliet conducted a recorded controlled/monitored call between the victim and the defendant. (R. 982, 1000).

Specifically, M.C. stepped out of the room while the victim called the defendant to attempt to elicit a confession or admission. (R. 982-83). In addition, M.C. provided Detective Meliet with a copy of a previously recorded conversation between the defendant and the victim and the victim's written notes documenting the things that she remembered. The victim confirmed that she wrote the notes and signed her name on them. (R. 983). Detective Meliet obtained a warrant for the defendant's arrest the next day, on August 15, 2017. On August 16, 2017,

---

[4] K.H., the victim in this case, was born on October 25, 1999. (R. 23, 1076). According to the earliest and latest approximate dates listed in the grand jury indictment, the victim was between the ages of ten and sixteen years old at the time of the offenses. (R. 23). Thus, we will use initials to identify or refer to the victim and her immediate family members. See La. R.S. 46:1844(W).

3

Detective Meliet contacted the defendant by phone, instructed him to come to the headquarters, executed a waiver of rights form,[5] and conducted an interview of the defendant. (R. 984, 1000-02; S-2).

During the approximately fifty-one-minute interview, the defendant did not unequivocally confess. However, as he was repeatedly confronted with the victim's allegations of oral sex and his own statements during the controlled recorded call, the defendant did not, at times, outright deny the allegations. The defendant admitted, moreover, that there were occasions when he and the victim slept in the same bed and that he continued to give the victim money, unbeknownst to M.C., after he and M.C. were separated. (S-3). Detective Meliet turned over the information he collected to the BPD, which agency arrested the defendant and charged him with aggravated rape. (R. 1006).

At trial, the victim testified that in the beginning of her fourth-grade school year, she was "scared of the dark," would wake up in the middle of the night, and would sleep in her parents' bed, although her mother was at work most of the time. At the time, she lived with her mother, brother, and the defendant in Baker. (R. 1076-79). The victim noted that on one occasion when she went into her parents' bedroom and got into their bed, her mother was not home. After she laid down, the defendant pulled her on top of him and brushed his "private" against her. (R. 1079-80). The victim detailed additional incidents, occurring in Baker, Zachary, and Baton Rouge, all locations where the family had moved, involving the defendant "jacking off" and/or "rubbing on" and "feeling on" her private parts and his own private. (R. 1088-91, 1103).

While living at a house on Rushmore Drive ("off of Florida") in Baton Rouge, the victim testified that an incident occurred when the defendant got off from work and came into her bedroom. The defendant asked the victim where her

---

[5] **Miranda v. Arizona**, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966).

4

brother was, at which point she told him that her brother was in his room, as she believed at the time. The defendant subsequently came back into the victim's bedroom, came to the side of her bed, and started touching her breasts and private area and rubbing himself. She stated that he ultimately pulled her clothes down, turned her over, and "did oral sex on me." (R. 1050-51, 1092-95; S-7).

**COUNSELED & PRO SE ASSIGNMENT OF ERROR NUMBER ONE**

In counseled assignment of error number one, the defendant argues that the State failed to meet its burden of proof as to count two, aggravated rape. He contends that the aggravated rape charge was based solely on the allegation that he performed oral sex on K.H. when they lived on Rushmore Drive. The defendant contends that K.H. was the only person making any claims and that there was no evidence or corroboration to prove that she was under thirteen years old when he performed oral sex on her. The defendant specifically argues that because the victim could not remember if the offense occurred before or after her thirteenth birthday, the State failed to prove the offense of aggravated rape. (Defendant's brief p. 13).

In pro se assignment of error number one, the defendant challenges the sufficiency of the evidence in support of count one, aggravated incest, count three, sexual battery, and count four, molestation of a juvenile. He notes that K.H.'s testimony was the only evidence presented against him. The defendant labels K.H.'s testimony as "impeached testimony" consisting of "internal inconsistencies." He argues that it was irrational for the jury to convict him based on such "unreliable evidence." Thus, he concludes that overturning the fact finder's "irrational decision" is constitutionally required in this case. (Defendant's pro se brief p. 4).

A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S. Const. amend. XIV; La. Const. art. I, § 2. In reviewing claims

5

challenging the sufficiency of the evidence, viewing the evidence in the light most favorable to the prosecution, an appellate court must determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. **Jackson v. Virginia**, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). See also La. Code Crim. P. art. 821(B) (pertaining to motions for post-verdict judgment of acquittal based on insufficiency of evidence); **State v. Ordodi**, 2006-0207 (La. 11/29/06), 946 So.2d 654, 660; **State v. Cockerham**, 2017-0535 (La. App. 1 Cir. 9/21/17), 231 So.3d 698, 703, writ denied, 2017-1802 (La. 6/15/18), 245 So.3d 1035.

When issues are raised on appeal contesting the sufficiency of the evidence and alleging one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. **State v. Hearold**, 603 So.2d 731, 734 (La. 1992). The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under **Hudson v. Louisiana**, 450 U.S. 40, 43, 101 S.Ct. 970, 972, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accordance with **Jackson v. Virginia**, supra, in the light most favorable to the prosecution, could not reasonably conclude that all of the essential elements of the offense have been proven beyond a reasonable doubt. See La. Code Crim. Proc. art. 821(B); **Ordodi**, 946 So.2d at 660; **Hearold**, 603 So.2d at 734.

When the entirety of the evidence is insufficient to support the conviction, the accused must be discharged as to that crime, and any discussion of trial error issues as to that crime would be pure dicta since those issues are moot. However, when the entirety of the evidence is sufficient to support the conviction, the accused is not entitled to an acquittal, and the reviewing court must then consider the other assignments of error to determine whether the accused is entitled to a new trial. If the reviewing court determines that there has been trial error (which was not harmless) in cases in which the entirety of the evidence was sufficient to

6

support the conviction, then the accused will be granted a new trial, but is not entitled to an acquittal. See **Hearold**, 603 So.2d at 734; **State v. Coleman**, 2017-1045 (La. App. 1 Cir. 4/13/18), 249 So.3d 872, 877, writ denied, 2018-0830 (La. 2/18/19), 263 So.3d 1155.

The **Jackson** standard of review, incorporated in Article 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. **State v. Legaux**, 2019-0075 (La. App. 1 Cir. 9/27/19), 288 So.3d 791, 794. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the fact finder, in order to convict, must be satisfied the overall evidence excludes every reasonable hypothesis of innocence. When a case involves circumstantial evidence and the trier of fact reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. **State v. Dyson**, 2016-1571 (La. App. 1 Cir. 6/2/17), 222 So.3d 220, 228, writ denied, 2017-1399 (La. 6/15/18), 257 So.3d 685.

Under former La. R.S. 14:78.1(A) (prior to repeal by 2014 La. Acts, Nos. 177, §2 & 602, §7), aggravated incest (count one) is defined, in pertinent part, as the engaging in any enumerated prohibited act with a person who is under eighteen years of age and who is known to the offender to be related to the offender as a biological, step, or adoptive child. Prohibited acts under former La. R.S. 14:78.1(B)(1) & (2), in pertinent part, included sexual battery (later defined), indecent behavior with juveniles, or "[a]ny lewd fondling or touching of the person of either the child or the offender, done or submitted to with the intent to arouse or to satisfy the sexual desires of either the child, the offender, or both." As set forth in La. R.S. 14:81(A)(1), indecent behavior with juveniles is defined, in pertinent part, as the commission, with the intention of arousing or gratifying the sexual desires of either person, of any lewd or lascivious act upon the person or in the

7

presence of any child under the age of seventeen, where there is an age difference of greater than two years between the persons. The word "lewd" means lustful or indecent and signifies that form of immorality that relates to sexual impurity carried on in a wanton manner. It is identified with obscenity and measured by community norms for morality. The word "lascivious" means tending to incite lust, indecent, obscene, and tending to deprave the morals in respect to sexual relations. **State v. Holstead**, 345 So.2d 493, 497-498 (La. 1997).

Aggravated rape (count two) is defined, in pertinent part, as a rape committed where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed when the victim is under the age of thirteen years. La. R.S. 14:42(A)(4). Pursuant to La. R.S. 14:41(A), rape is defined as the act of anal, oral, or vaginal sexual intercourse with a male or female person committed without the person's lawful consent. Oral sexual intercourse is defined, in pertinent part, as the intentional engaging in the act of touching the anus or genitals of the victim by the offender using the mouth or tongue of the offender. La. R.S. 14:41(C)(1).

Pursuant to La. R.S. 14:43.1(A)(1) & (2) (prior to amendment by 2015 La. Acts, No. 256, §1), sexual battery (count three) is defined, in pertinent part, as the intentional touching of the anus or genitals of the victim by the offender using any instrumentality or any part of the body of the offender without the consent of the victim or when the victim has not yet attained fifteen years of age and is at least three years younger than the offender.

Under La. R.S. 14:81.2(A), molestation of a juvenile (count four) is defined, in pertinent part, as the commission by anyone over the age of seventeen of any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons, with the intention of arousing or gratifying the sexual desires of

either person, by the use of influence by virtue of a position of control or supervision over the juvenile.

Aggravated incest, aggravated rape, and sexual battery (counts one, two, and three) are general intent crimes, thus, the only intent necessary to sustain a conviction is established by the very doing of the proscribed acts. See La. R.S. 14:11; see also **State v. D.M.**, 42,038 (La. App. 2 Cir. 5/9/07), 958 So.2d 77, 84; **State ex rel. L.W.**, 2009-1898 (La. App. 1 Cir. 6/11/10), 40 So.3d 1220, 1224, writ denied, 2010-1642 (La. 9/3/10), 44 So.3d 708; **State v. Stevenson**, 2005-52 (La. App. 5 Cir. 6/28/05), 908 So.2d 48, writ denied, 2005-2592 (La. 6/2/06), 929 So.2d 1247. General criminal intent is present whenever there is specific intent, and also when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act. La. R.S. 14:10(2). However, indecent behavior with juveniles (a potential element of count one) and molestation of a juvenile (count four) are specific intent crimes. **State v. Bedwell**, 2018-0135 (La. App. 1 Cir. 6/21/18), 2018 WL 3080356, *13, writ denied, 2018-1247 (La. 1/18/19), 262 So.3d 288; **State v. McKinney**, 2015-1503 (La. App. 1 Cir. 4/25/16), 194 So.3d 699, 703, writ denied, 2016-0992 (La. 5/12/17), 220 So.3d 747. Specific criminal intent is that state of mind that exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Specific intent need not be proven as a fact. It may be inferred from the circumstances of the transaction and the actions of the defendant. Specific intent is an ultimate legal conclusion to be resolved by the fact finder. **McKinney**, 194 So.3d at 703.

On August 11, 2017, the victim made a disclosure to Deanna Auzenne, a counselor at the Battered Women's Program. Auzenne had befriended M.C., who was a residential assistant at the time. (R. 1019, 1020-22). Auzenne specifically

9

testified that M.C. had given her permission to have a "one on one" conversation with the victim. Auzenne testified that she wanted to find out what was going on. She further testified, "I pressed it, because I could tell she wasn't saying anything. And I said that, you know, [K.H.], whatever it is ... And then that is when she told me that [the defendant] molested her when she was a child." (R. 1021-22). That same day, Auzenne informed M.C. of the victim's disclosure. The victim then called the defendant on speakerphone and made the recording later given to Detective Meliet. (R. 1022).

Detective Meliet noted that his goal in interviewing potential victims of sexual assault is to find out if the victim can describe certain body parts of the suspect, typically a man, which the alleged victim would not have seen absent the alleged abuse. He noted that in this case, the victim was able to describe such a body part of the defendant. Detective Meliet further noted that victims of long-term abuse have difficulty remembering every single act through the years, as the incidents, in his experience, tend to "run together." (R. 981). Thus, Detective Meliet attempted to ascertain the location of the incidents, noting that the incidents happened multiple times over the years and that they began in Baker. Detective Meliet further stated that he was aware that the victim lived at two addresses in Baton Rouge and that the victim provided details as to what happened at both locations. (R. 981).

M.C. testified she married the defendant in June 2006, when the victim was six years old. (R. 1034). They lived in an apartment in Baton Rouge until November of 2006, when they bought a house in Baker. (R. 1034-35). M.C. testified that the defendant and K.H. had a normal relationship and that K.H. was the first of her two children to call the defendant "Daddy." She specifically noted that her son took a little longer to adjust to the defendant. (R. 1035). M.C.

confirmed that the victim lived at the house in Baker her entire third-grade year and the first half of her fourth-grade year. (R. 1043).

The victim's academic performance became poor when she was in the fourth grade; she was getting into trouble and fights with other children and disrupting class. Therefore, during the second half of her fourth-grade year, M.C. sent the victim to live with her biological father and grandmother until the end of her fifth-grade school year. (R. 1037-38). M.C. testified that the victim was doing okay in school while living with her father, but was still getting into trouble at school and even got suspended from school while in the fifth grade. (R. 1038-39). At that point, M.C. became angry and did not understand why the victim was misbehaving. She questioned the victim as to what was wrong and asked her if she had ever been "touched." The victim responded that she had, indicating that it was the defendant who touched her. (R. 1039). M.C. testified that she was in shock and unsure of what to believe at that moment, but continued to question the victim. M.C. asked the victim to show her how the defendant touched her, and the victim then rubbed M.C.'s butt in a groping motion. (R. 1039-40). At that point, M.C. believed the victim and became enraged. (R. 1040).

The next day, M.C. called "East Baton Rouge police" and reported K.H.'s allegations. After providing her address, M.C. was instructed to go to the police station in Baker. The Baker police instructed M.C. to bring K.H. to the station for an interview, which she did that same day. M.C. testified that she was not allowed in the room during the interview. (R. 1040-41). That night, M.C. told the defendant about the victim's claims, at which point the defendant became enraged. M.C. testified that although the victim was living with her grandmother at the time, she would go pick her up on the weekends. M.C. stated that the defendant did not want the victim to come to the house anymore. (R. 1042). The victim temporarily stopped having contact with the defendant after her disclosure. (R. 1044).

11

M.C. and the defendant later lost their home to foreclosure and moved to a two-bedroom apartment in Zachary, along with M.C.'s son. (R. 1044). M.C. testified that while the victim's behavior issues settled down a little, her academic performance was "horrible." She specifically noted that the victim had "straight F's" in school. Thus, M.C. talked to the defendant about slowly introducing the victim back into their home and started picking the victim up on weekends again. The victim and her brother would share a room when the victim stayed there. At that point, the victim was no longer referring to the defendant as "Daddy" and instead called him by his nickname, "Bo Bo." (R. 1046).

The family subsequently moved to a three-bedroom apartment on Parkcrest Court in the Woodlawn school district in Baton Rouge, where the victim permanently moved in with the rest of the family and attended Woodlawn Middle School. (R. 326, 331, 1047-49). M.C. noted that the victim was never left alone in the apartment with the defendant, specifying that either she, her son, or "somebody else" was in the home with them. They lived in that apartment for approximately a year and a half, including the victim's sixth-grade school year in its entirety, until they moved to a house on Rushmore Drive, also in Baton Rouge. (R. 1048; S-7).

When they moved to Rushmore Drive, M.C. was attending school full-time and working overnight from 7:00 p.m. until 7:00 a.m., at Woman's Hospital. The defendant was a truck driver making gas deliveries at the time and had sporadic hours, sometimes getting off at 1:00 or 2:00 in the morning. (R. 1048-50). M.C. confirmed that when they were living at the house on Rushmore Drive, her son snuck out of the house overnight while M.C. was at work. After the defendant called M.C. at work and told her that her son was not home, M.C. called her son's girlfriend's house and discovered that her son was there. Thus, the defendant was home alone with the victim at that time. (R. 1050-51).

12

At some point, while they were living at the house on Rushmore Drive, M.C. began sleeping in K.H.'s bedroom whenever she and the defendant would argue. (R. 1051-52). Then, during the summer of 2013, when K.H. was in the seventh grade, the defendant and M.C. separated. M.C. and her children moved to an apartment on Tiger Bend Road while the defendant remained in the house on Rushmore Drive. (R. 1052-53; S-10). M.C. and her children stayed on Tiger Bend Road for two years and then moved to an apartment on Jefferson Highway where they stayed for an additional two or three years. K.H. was in the ninth grade at Woodlawn at the time and then attended Broadmoor High in the tenth grade. (R. 1053-55). M.C. noted that she had not filed for a divorce yet and still had a sexual relationship with the defendant. (R. 1054, 1056). When the victim was in the eleventh grade, M.C. and her children moved to Silverleaf Drive. (R. 83, 1057).

M.C. confirmed that in August 2017, while they were still living on Silverleaf Drive, Auzenne had a conversation with M.C. regarding the victim, prompting M.C. to tell the victim to call the defendant on speakerphone, as M.C. recorded the conversation with her cell phone. (R. 1058-59). Prior to that day, M.C. had been unaware that the victim and the defendant communicated by phone. (R. 1067). M.C. instructed the victim to make handwritten notes of as much as she could remember about what occurred between the victim and the defendant and turned over the recording of the conversation and the victim's written notes to the police.[6] (R. 1059-61).

M.C. noted that during the recorded conversation, the defendant asked the victim for a hug. She testified that the defendant would often ask her for a hug

---

[6] During the recorded conversation, after the victim told the defendant that she was home alone, the defendant stated, "I wish I coulda [sic] came and got me a hug." The defendant added, "What you think about that?" The victim replied, "All you want is a hug?" The defendant replied, "Why you say it like that?" The defendant subsequently stated that he would come "get a hug and go" if that was okay with the victim. The victim told the defendant that she would call him back, and the phone call was terminated. (S-1/S-1A).

when they were dating and that "it almost always ended up in a sexual act." (R. 1061). M.C. confirmed that she informed Detective Meliet that the defendant was uncircumcised, that he sometimes had erectile dysfunction, and that he most often performed oral sex on M.C. and would "play with himself" while doing so. (R. 1062-63, 1065). She divorced the defendant in 2016. (R. 1063, 1071; S-11).

**Aggravated Incest and Aggravated Rape**

As charged in the indictment, the offenses of aggravated incest and aggravated rape are alleged to have occurred between the approximate dates of October 26, 2009 and October 24, 2012, when the victim was between the approximate ages of ten and twelve years old. (R. 23). The first incident described by the victim at trial occurred in Baker, at the beginning of her fourth-grade school year. (R. 1035). That particular night, M.C. was at work when the victim, who was afraid of the dark at the time, got into her parents' bed with the defendant. (R. 1079-80). The victim initially thought the defendant was asleep but realized he was awake when he moved. She testified that after she laid down, the defendant "pulled me on top of him." She further stated, "He like brushed against me." When asked with what, she stated, "His private." (R. 1080). When asked how she was positioned on top of the defendant, the victim specified that her legs were on top of the defendant's leg, adding, "Like I was on top of him like just laying there." (R. 1080). When further describing the defendant's actions, the victim specifically stated that the defendant "pushed his private up against mine." She testified that the defendant's private was "hard" at the time. She added, "It didn't last long. But I just acted asleep the whole time." The victim confirmed that she was wearing pajamas at the time. (R. 1081).

The victim testified that the same conduct occurred again at the same house (in Baker) in her bedroom. (R. 1081). She specifically stated that she would sometimes wake up in the middle of the night and the defendant would be in bed

14

next to her. (R. 1081-82). She further stated, "He would pull me on top of him and get a reaction from himself." She added, "And when he was done he would leave." She noted that she was clothed when this occurred and that the defendant would be wearing boxers, a shirt, and socks. (R. 1082). The victim testified that the defendant would also put his mouth on her breasts, while they were living in Baker. (R. 1153).

K.H. testified that the defendant would always tell her that they had their own special relationship. (R. 1082). She confirmed that she began having behavior problems at school and that her mother sent her to live with her biological father and grandmother. She recalled first telling her grandmother, in January 2010, about the defendant touching her inappropriately. (R. 1084). She noted that she did not tell her mother until her mother asked if something happened. She confirmed that she had been suspended from school when her mother asked her why she was "acting out" and did "something happen." At that point, she told her mother what happened. (R. 1084-85). K.H. recalled going to the police station "a few weeks later,"[7] but stated that she told the detectives that "it [her claim that the defendant was touching her] was a mistake." (R. 1085). When asked why she told the police it was a mistake, she stated, "They made my momma leave out the room, and I was scared to be there by myself." (R. 1085).

The victim described another incident that occurred when she was visiting her mother at the apartment in Zachary, where M.C. and the defendant lived when the victim was in the fifth grade. The victim specifically testified that the incident occurred in a walk-in closet, in the room that she and her brother shared whenever she would visit. She stated that she was in the closet when the defendant entered the room. The victim testified that the defendant entered the closet and pulled

_____

[7] As previously noted, the victim was brought to the BPD on January 26, 2010, when she was ten years old. (R. 1026-27, 1029).

down her lower clothing and underwear. She further stated that the defendant "got aggressive" and looked angry when she tried to pull her clothes back up and that he pulled them back down. (R. 1043-44; 1087-88). According to the victim, the defendant said he "would have killed us" if she screamed. She stated that the defendant started "rubbing on" her private area and his own private ("jacking off"). (R. 1088). She further stated that the defendant would always leave after he finished. (R. 1090). The victim realized, after the fact, that the defendant would do the same thing in Baker. She stated, "He would always rub his private or move it around or rub it against me." (R. 1089).

K.H. confirmed that she moved back in with her mother and the defendant when they moved to Parkcrest Court in Baton Rouge, while she was in the sixth grade. (R. 1048, 1091). She further testified, "I guess he thought because I was older it was okay for him to rub his privates against mine."[8] (R. 1090). She stated that the defendant would "just pull me on top of him." She explained that at times, she would "wake up and he will be next to me." She testified that other times, "I will come home, get off the bus, my mom wasn't there, he will come in my room." She noted that this happened "a lot of times." When asked to describe the defendant's penis, she stated, "It had a lot of extra skin." She noted that she observed the defendant pull the extra skin over his private area before walking out of her room. (R. 1091).

Regarding the incident at the house on Rushmore Drive, where they moved when the victim was in the seventh grade, the victim testified that one night her brother snuck out of the house to go to his girlfriend's house. (R. 1048, 1092-93, 1167). She stated that the defendant came into her bedroom, to the side of the bed and began "touching on me" and "rubbing himself." She specified that the

---

[8] When asked if the defendant had done this before, the victim responded, "No ma'am." However, as stated herein, the victim had previously testified that the defendant "pushed his private up against mine" when she was in the fourth grade. (R. 1081).

16

defendant was "feeling on" her breasts and private area, initially over her clothing before eventually pulling them down, as she pretended to be asleep. (R. 1094-95). The defendant then turned her over and "did oral sex on me." When asked to describe "oral sex," she stated, "he put his mouth on my private area." She further stated, "I tried to get up, and he pushed me back down." When initially asked if this ever happened before, she replied, "No, ma'am." (R. 1095). When asked if the defendant did anything else to her private, in addition to putting his mouth on her private, the victim stated that the defendant also laid on her and "rubbed his private against mine." (R. 1095). When later specifically asked if she recalled how many times the defendant put his mouth on her vagina, she replied, "I think, maybe once or twice, but I don't know the exact number." (R. 1155).

**Molestation of a Juvenile and Sexual Battery**

On count three, the indictment charges the defendant with the offense of sexual battery that occurred between the approximate dates of October 26, 2012 and October 24, 2014, when the victim was between the approximate ages of thirteen and fourteen years old. (R. 23). The indictment alleges that molestation of a juvenile offense occurred between the overlapping approximate dates of June 1, 2013 and October 24, 2016, when the victim was between the ages of thirteen and sixteen years old. (R. 23).

When the victim was asked if anything else occurred while they were living on Rushmore Drive, she testified that one day the defendant called her into his and her mother's bedroom while "a porno" was on the television. (R. 1096). The victim was asked to provide the meaning of the word "porno" and stated, "they were just doing sexual things to each other." (R. 1096). The victim stated that as she stood by the door, the defendant got out of bed and "started to touch on me and rub on me[,]" adding, "[m]y breasts and my private, and my butt." (R. 1096-97). She testified that the defendant used one hand to touch her, as he used his other

17

hand to touch his own private area. She noted that the defendant was touching her over her clothing and that her brother was home at the time. (R. 1097). When asked what happened after the defendant finished masturbating, the victim stated that she left the room, as she was "uncomfortable." She stated that she had never seen pornography before this incident. (R. 1097).

The victim confirmed that they moved to apartments off Tiger Bend Road when she was thirteen years old (the summer of 2013, after the victim's seventh-grade school year). The victim testified that after they moved off Tiger Bend Road, she had no physical contact with the defendant, though he would still call her. (R. 1098). She stated, "He would give us money and stuff and still tell us that he would always be there for us no matter what and stuff like that." (R. 1099).

The victim, her mother, and her brother moved to an apartment complex called Jefferson Arms (on Jefferson Highway), when the victim was in the ninth grade, and while living there, the victim saw the defendant again. (R. 1054-55, 1099-1100). The victim stated she would call the defendant for things like "money, shoes, because I knew he would give it to me." (R. 1100). The victim described her last contact with the defendant as occurring when she called him for some money. Later, the victim's cousin asked her to babysit and said she would pay the victim, so the victim no longer needed money from the defendant. When the defendant showed up at her home, the victim did not let the contact go any further than touching. The victim said the defendant became frustrated and left without giving her the money that she had asked for. (R. 1103). She described the "touching" as "feeling on me over my clothes, just feeling on my boobs and my private area." (R. 1103). That was the last time that the defendant ever touched her sexually. (R. 1164).

The victim confirmed the telephone conversation between she and the defendant recorded by her mother and her handwritten notes. (R. 1108-10; 1137-

18

38, 1140; S-1/S-1A; S-14).   In the handwritten notes, consistent with her trial testimony, the victim first recounted the incident in Baker when she got into her mother's bed with the defendant after having a bad dream.  She wrote in part that the defendant "pull me on top of him" and added, "I was awoken I tried to get of [sic] him but he held me down and I felt his penis get hard and he dry humped me." Also noted as occurring in Baker, the victim wrote as follows, "He came into my bedroom and forced me on the bed and he went down on me.  I've move away from the house with my mom and went to go stay with my dad."  Consistent with her trial testimony, the victim's notes recount subsequent acts of a sexual nature in Zachary (including the incident in "a huge walk in [sic] closet") and in Baton Rouge, "off of Florida" (including the incident occurring while the defendant was watching "a porn video").  (S-14).

At trial, the victim further confirmed and repeated statements made during the controlled recorded call made at the BRPD with Detective Meliet.  (R. 1114-37).  During the controlled phone call, the victim told the defendant that she was going to get her own apartment when she turned eighteen and that he could come over whenever he wanted.  The defendant told her he would help her since she would be by herself.  The victim then asked the defendant if he knew how long she had been knowing him, and stated, "That's when I started having feelings for you [the defendant] in the fourth grade...Yeah cuz we was staying in Baker."  She added, "That's when everything started to happen."  The defendant in part replied, "We got our own, you know our own special relationship ... Don't nobody know that but me and you."  The victim subsequently stated, "That's the first time you went down on me too, you remember that?"  The defendant replied, "Yeah, I do"[9]

---

[9] This account of the response by defendant comes from the victim's testimony at trial, as she was questioned as to what was being said in portions of the recording while it was being played to the jury. (R. 1125). However, in listening to the recording, we note that it sounds like the defendant responded, in part, "Hell yeah" or "Oh Yeah." (S-1/S-1A).

and added, "You like that?" The victim responded positively. The defendant noted that he never heard the victim speak so openly about it, and she explained that she was older and could talk openly about it to him, but not to others. The defendant asked the victim to text her mother to find out where her mother was at the time and indicated that he wanted to come get a hug "right quick." (S-1/S-1A).

The victim subsequently stated, "You remember the night um you had came home and [my brother] ... was gone to [his girlfriend] house? ... That's another night you had went down on me too, you remember that?" The defendant replied, "You remember all that huh?" She asked the defendant if he remembered how old she was and he replied, in part, "Nah." The victim also asked the defendant, "Why you never took it further with us though?" In response, the defendant stated that he did not know why, adding, "at that time I mean ... you was young." The victim agreed, stating, "that's why you never penetrated," and the defendant agreed, but asked, "Why, what you had thought about it?" The victim responded positively. (S-1/S-1A).

As the trier of fact, the jury was free to accept or reject, in whole or in part, the testimony of any witness. The fact that the record contains evidence which conflicts with the testimony accepted by a trier of fact does not render the evidence accepted by the trier of fact insufficient. In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. Further, the testimony of the victim alone is sufficient to prove the elements of the offense. **State v. Clouatre**, 2012-0407 (La. App 1 Cir. 11/14/12), 110 So.3d 1094, 1100. It is the fact finder who weighs the respective credibilities of the witnesses, and this court will generally not second-guess those determinations. **Coleman**, 249 So.3d at 878.

At the outset we note that the victim's testimony describing the defendant's private as having "a lot of extra skin" was consistent with M.C.'s testimony that the defendant was uncircumcised. (R. 1062, 1091). Thus, the jury could have reasonably found credible the victim's testimony that she had been exposed to the defendant's penis. We further note that during his pretrial interview, the defendant admitted that there were occasions when the victim slept in the same bed with him. (S-3). Moreover, while we note that the sex offenses charged herein contain overlapping elements, we note that the jury was only required to determine that four incidents, one separate incident for each of the charged offenses, included each element of a particular offense.

During the time in question, the defendant, who had been the victim's stepfather since she was six years old, had continuous influence, control, and supervision over the victim. The victim considered the defendant her "Daddy" and was repeatedly told that they had a special relationship. The testimony and written evidence submitted to the jury was very detailed as to several lewd and lascivious acts committed by the defendant on the victim when she was well under the age of seventeen. Moreover, with regard to the aggravated rape charge, we reiterate that the defendant only challenges the sufficiency of the evidence to show that the victim was under thirteen years old at the time that he had oral sex with her.

Eleven of twelve jurors apparently rejected the defendant's hypothesis of innocence that K.H. was not under thirteen years old when the defendant engaged in oral sex. Further, the jury unanimously found that the State proved the defendant committed the other sex offenses. Based on the evidence presented, we cannot say that the jury's determinations were irrational. The resolution of factual matters, which depends upon a determination of the credibility of the witnesses, involves the weight of the evidence, not its sufficiency. See **State v. Johnson**, 99-0385 (La. App. 1 Cir. 11/5199), 745 So.2d 217, 223, writ denied, 2000-0829 (La.

11/13/00), 774 So.2d 971. The jury's factual determination will not be overturned on appeal.

We find that a rational trier of fact could have found that the defendant orally raped K.H. when she was under the age of thirteen and committed the other lewd and lascivious acts charged herein. Thus, viewing the evidence in the light most favorable to the prosecution, we are convinced that a rational trier of fact could find that the State proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, the elements of aggravated incest, aggravated rape, sexual battery, and molestation of a juvenile. Therefore, the defendant is not entitled to an acquittal in this case, and the assigned trial error must be addressed. We find no merit in the counseled or pro se assignment of error number one.

## PRO SE ASSIGNMENT OF ERROR NUMBER TWO

In pro se assignment of error number two, the defendant argues that the trial court's denial of his pretrial motion to continue constitutes prejudicial error.[10] The defendant notes that on June 21, 2019, the State filed a supplemental and amending discovery response, disclosing, in part, that the victim "clarified the following" during trial preparation, "[t]he defendant placed his mouth on her vagina only one time and this occurred inside the residence located on Rushmore." (R. 323). As the defendant further notes in his brief, when the trial began on June 24, 2019, his trial counsel filed a written motion to continue based on an "untimely disclosure of **Brady/Kyles** evidence and other materials." (R. 339-42). (Pro se brief p. 5). The

---

[10] We note that the defendant filed an application for supervisory review in this court, in part, challenging the trial court's denial of his motion to continue. This court denied the defendant's writ. **State v. Brown**, 2019-0827 (La. App. 1 Cir. 6/25/19), 2019 WL 2598175 (R. 404). Although a pretrial determination does not absolutely preclude a different decision on appeal, judicial efficiency demands that this court accord great deference to its pretrial decisions unless it is apparent, in light of a subsequent trial record, that the determination was patently erroneous and produced an unjust result. See **State v. Humphrey**, 412 So.2d 507, 523 (La. 1982) (on rehearing); **State v. Patterson**, 2008-0416 (La. App. 1 Cir. 9/26/08), 995 So2d 38, 40.

defendant argues that the denial of his motion to continue lacked fundamental fairness due to his trial counsel's inability to properly investigate the change in the victim's allegations, which, he argues, spoke directly to an element of aggravated rape and could have potentially undermined the victim's credibility. (Pro se brief p. 6).

The defendant argues that trial counsel was misled as to the evidence in believing that the victim would testify as to multiple counts of oral sex. He argues that timely disclosure to the contrary would have allowed defense counsel to address the victim's specific allegation with extrinsic evidence not available to multiple offenses within a particular timeline. For example, the defendant notes that according to testimony, the victim changed residences in the middle of the seventh grade. The defendant contends that with adequate notice, counsel could have sought school records or other documentary evidence to challenge that claim. (Pro se brief p. 6). The defendant further argues that the State's late disclosure hindered trial counsel's ability to effectively cross examine the victim. He contends that the conviction(s) and sentences should be reversed, and the case should be remanded for a new trial based on this error. (Pro se brief p. 7).

The purpose of pretrial discovery procedures is to eliminate unwarranted prejudice to a defendant that could arise from surprise testimony. **State v. Elie**, 2005-1569 (La. 7/10/06), 936 So.2d 791, 802. Discovery procedures enable a defendant to properly assess the strength of the State's case against him in order to prepare his defense. **State v. Herron**, 2003-2304 (La. App. 1 Cir. 5/14/04), 879 So.2d 778, 787. If a defendant is lulled into a misapprehension of the strength of the State's case through the failure of the prosecution to timely or fully disclose and the defendant suffers prejudice, basic unfairness results that constitutes reversible error. **State v. Harris**, 2000-3459 (La. 2/26/02), 812 So.2d 612, 617. The State's failure to comply with discovery requests does not constitute reversible error

23

unless actual prejudice results to the defendant. **State v. Selvage**, 93-1435 (La. App. 1 Cir. 10/7/94), 644 So.2d 745, 750, <u>writ denied</u>, 94-2744 (La. 3/10/95), 650 So.2d 1174. Accordingly, a conviction should not be reversed because of an erroneous ruling on a discovery violation absent a showing of prejudice. **State v. Gaudet**, 93-1641 (La. App. 1 Cir. 6/24/94), 638 So.2d 1216, 1220, <u>writ denied</u>, 94-1926 (La. 12/16/94), 648 So.2d 386.

Herein, at the hearing on the motion to continue, the defense attorney noted in part that he had not been able to review the State's supplemental discovery response clarifying the victim's statement. (R. 455). Regarding the supplemental response at issue, the State noted that in preparation for the trial, the victim was interviewed, at which point she indicated that the oral sex occurred one time and provided the location of the incident. In response to the trial court's inquiry as to whether there was a previous suggestion or statement indicating that oral sex occurred more than once, the State noted that the case involved reports to both the BRPD and the BPD and involved years of ongoing sexual abuse. (R. 457). The State further noted that as to the type of trauma involved in this case, victims often do not disclose each and every specific act. Further noting that the defense attorney would be able to cross examine the victim, the State argued that the clarification in the supplement did not rise to the level that would indicate a continuance was necessary. (R. 459). The defense attorney, in response, argued that based on the clarification, the allegation that would support a life sentence went from an "almost indeterminate period of time" to a single event requiring additional investigation to prepare for trial. (R. 460). In denying the motion to continue, the trial court noted that the State provided all of the evidence that it had in its possession in discovery, well in advance of trial. The trial court found that the State complied with its obligation in conveying the supplemental response at

24

issue to the defense as possible material for cross-examination and impeachment of the victim. (R. 462).

The granting or denial of a motion for continuance rests within the sound discretion of the trial court, and its ruling will not be disturbed on appeal absent a showing of a clear abuse of discretion. **Legaux**, 288 So.3d at 797. According to the State, the evidence in question was not discoverable as the "clarification" was made by the victim during a pretrial preparation interview. We find no violation of the rules of discovery by the State in presenting the defendant with the information at issue once it was obtained. We agree with the trial court's assessment in that the statement at issue consisted of subject matter for cross-examination by the defense. Further, as the victim was thoroughly cross-examined at trial regarding any allegation of oral sex, specifically as to when, where, and the number of times, and confronted with pretrial statements and her handwritten notes, the defendant has failed to demonstrate any prejudice to his case caused by the State. (R. 1166-69, 1171-72). We find no abuse of discretion in the denial of the motion to continue. Pro se assignment of error number two lacks merit.

### PRO SE ASSIGNMENT OF ERROR NUMBER THREE

In pro se assignment of error number three, the defendant argues that an "improper argument" made by the State during its opening statement was "particularly egregious and prejudicial[.]" (Pro se brief p. 8). Specifically, the defendant cites **State v. Frank**, 99-0553 (La. 5/22/07), 957 So.2d 724, 741, cert. denied, 552 U.S. 1189, 128 S.Ct. 1220, 170 L.Ed.2d 75 (2008) and argues that the State violated the "Golden Rule" when it asked the jury to place themselves in the shoes of the victim and her mother during its opening statement. (Pro se brief p. 7). He further argues that the use of the argument by the State was "inherently inappropriate" and created "an improper lens through which the jury was then

invited to view all evidence presented at trial." (Pro se brief p. 8). Thus, he argues that he should be granted a new trial on this basis.

The opening statement of the State shall explain the nature of the charge, and set forth, in general terms, the nature of the evidence by which the State expects to prove the charge. La. Code Crim. P. art. 766. The opening statement is designed to inform the jury so they may understand the evidence as it unfolds and to protect a defendant from surprise. **State v. Green**, 343 So.2d 149, 151 (La. 1977). Even if the prosecutor exceeds these bounds, an appellate court will not reverse a conviction if not thoroughly convinced that the argument influenced the jury and contributed to the verdict. See **Frank**, 957 So.2d at 741. Statements made outside the permissible scope of an opening statement may result in a mistrial under La. Code Crim. P. arts. 770 and 771. **State v. Banks**, 2009-0052 (La. App. 1 Cir. 6/12/09), 2009 WL 1655006, *2, writ denied, 2009-1609 (La. 3/12/10), 28 So.3d 1024.

In this case, the defendant complains of the following specific portion of the State's opening statement:

> She [K.H.] is going to explain to you that her childhood was broken. It was taken away from her starting in the 4th grade, because the defendant who she called daddy, who was her stepfather, sexually abused her then, and for many years to come. When you hear from her, as well as her mother, I ask that you listen objectively, but I also ask that you put yourself in their position and think about the shame, the pressures –

At this point, the defendant objected to the State asking the jury to put themselves in the position of the victim, adding "that's literally called like the golden rule" and "grounds for a mistrial." (R. 972-73). The trial court disagreed that the State's comment was grounds for a mistrial, and the defendant did not request an admonition. (R. 973).

Here, the defendant did not move for a mistrial under any of the mandatory grounds for mistrial listed in La. Code Crim. P. art. 770, nor do we find any of

26

them applicable.[11] The defendant's motion for mistrial was solely based on the "golden rule" argument presented herein. Under Article 771, discretionary grounds for a mistrial are provided, in part, as follows:

> In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
>
> (1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770;
>
> . . . .
>
> In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.

A mistrial is warranted when certain remarks are considered so prejudicial and potentially damaging to the defendant's rights that even a jury admonition could not provide a cure. **State v. Edwards**, 97-1797 (La. 7/2/99), 750 So.2d 893, 906, cert. denied, 528 U.S. 1026, 120 S.Ct. 542, 145 L.Ed.2d 421 (1999). However, a mistrial is a drastic remedy and warranted only when substantial prejudice will otherwise result to the accused. **Banks**, 2009 WL 1655006 at *3.

We note that the Louisiana Supreme Court has rejected similar "golden rule" arguments. In **State v. Wessinger**, 98-1234 (La. 5/28/99), 736 So.2d 162, cert. denied, 528 U.S. 1050, 120 S.Ct. 589, 145 L.Ed.2d 489 (1999), the court held remarks in which the prosecutor urged jurors to put themselves in the victim's position just before she died were not so prejudicial that it would befuddle jurors into disregarding the law as given to them by the trial judge. **Wessinger** 736 So.2d

---

[11] Under Article 770, a mistrial may be mandated upon request of a defendant when the judge, district attorney, or a court official, during the trial or argument, refers to: (1) race, religion, color or national origin; (2) another crime committed by the defendant as to which evidence would not be admissible; (3) the failure of the defendant to testify in his own defense; or (4) the refusal of the judge to direct a verdict.

at 187. In **Frank**, 957 So.2d at 744, the court considered remarks in which the prosecutor urged the jurors as follows, "on behalf of these people...look in your mind's eye, and I would ask you to consider and to see the horror of the last few minutes of these lives." Quoting **Wessinger** in part, the court found that "while the prosecutor's argument was arguably improper, the remarks did not urge the jury 'to disregard the law as given to it in the instructions of the trial court.'" In **State v. Manning**, 2003-1982 (La. 10/19/04), 885 So.2d 1044, 1095, cert. denied, 544 U.S. 967, 125 S.Ct. 1745, 161 L.Ed.2d 612 (2005), the prosecutor urged the jury to consider, "what do you think was going through that poor lady's mind when she's out on that dirt road on a cold, cold night." Again quoting **Wessinger** in part, the court held, "while the State's argument speculating on the victim's fear before she was murdered bordered on improper, the remarks did not urge the jury 'to disregard the law as given to it in the instructions of the trial court.'" **Manning**, 885 So.2d at 1096.

We similarly find that the comment at issue was not prejudicial nor did it urge the jury "to disregard the law as given to it in the instructions of the trial court." **Id**. Prior to the opening statements, the trial court instructed the jury as follows, "The opening statement is just an outline of what the lawyers think will or will not be shown by the evidence in the case." (R. 967). Prior to deliberations, the trial court stated in part, "Statements and arguments made by the attorneys are not evidence. ... It's the lawyer's analysis, interpretation, conclusion, and theory of the case. You may accept it or reject it ..." (R. 1208-09). The Louisiana Supreme Court has stated that "a great deal of credit should be accorded to the good sense and fairmindedness of jurors who have heard the evidence and who know what was and was not proven." **State v. Dupre**, 408 So.2d 1229, 1234 (La. 1982). There is no indication that the jurors convicted the defendant based on the prosecutor's remark. We find no abuse of discretion in the denial of a mistrial on

the grounds asserted herein. Pro se assignment of error number three is without merit.

## COUNSELED ASSIGNMENT OF ERROR NUMBER TWO

In counseled assignment of error number two, the defendant notes that he was convicted by a non-unanimous jury and contends that this court should review the verdict as patent error.[12] (Defendant's brief p. 14). The defendant contends that the law is clear under the Sixth Amendment that the government can only sustain a conviction and sentence at hard labor based upon a unanimous verdict. The defendant argues that in light of **Ramos v. Louisiana,** ___ U.S. ___, 140 S.Ct. 1390, 206 L.Ed.2d 583 (2020), a conviction premised on a non-unanimous jury vote should readily constitute both a structural and an error patent. (Defendant's brief p. 14). In its appellee brief, the State concedes that the defendant is entitled to a new trial for the count of aggravated rape only. (State's brief p. 16).

In the recent decision of **Ramos,** 140 S.Ct. at 1397, the United States Supreme Court overruled **Apodaca v. Oregon,**[13] 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972), and held that the right to a jury trial under the Sixth Amendment of the United States Constitution, incorporated against the States by way of the Fourteenth Amendment of the United States Constitution, requires a unanimous verdict to convict a defendant of a serious offense. Thus, the **Ramos** Court declared non-unanimous jury verdicts for serious offenses unconstitutional. The **Ramos** Court further indicated that its ruling applied to those defendants

---

[12] We note that the defendant challenged the possibility of being convicted by a non-unanimous jury verdict before trial in a motion and lodged an objection to the non-unanimous verdict on count two at the conclusion of the trial. (R. 132, 1240). Hence, he properly preserved the issue for appellate review. Moreover, based on the defendant's designation of such as error, the matter is properly reviewed on appeal pursuant to his assignment of such as error. See La. Code Crim. P. art. 920(1).

[13] Oregon's non-unanimous jury verdict provision of its state constitution was challenged in **Apodaca. Johnson v. Louisiana,** 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972), decided with **Apodaca,** upheld Louisiana's then-existing constitutional and statutory provisions allowing nine-to-three jury verdicts in criminal cases.

convicted of felonies by non-unanimous verdicts whose cases are still pending on direct appeal. See **Ramos**, 140 S.Ct. at 1406; see also **Griffith v. Kentucky**, 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987) ("a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past.").

As noted, herein, the polling of the jury reveals that eleven of the twelve jurors concurred to render the verdict on count two, while the remaining counts were unanimous. (R. 390-402, 1239). Pursuant to the decision in **Ramos**, the non-unanimous jury verdict on count two in this case is unconstitutional. Thus, we set aside the conviction and sentence on count two, and the case is remanded for a new trial on count two. Counseled assignment of error number two has merit.

## PATENT ERROR REVIEW

This court routinely reviews criminal appeals for patent error pursuant to La. Code Crim. P. art. 920, which provides that the only matters to be considered on appeal are errors designated in the assignments of error and "error that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence." La. Code Crim. P. art. 920(2). In this case, in addition to the error discussed above in addressing assignment of error number two, our patent error review revealed the following.

On November 25, 2019, the day before the sentencing, the defendant filed a combined motion for new trial and post-verdict judgment of acquittal. The trial court denied the motion at the sentencing hearing, just before the imposition of the sentences. (R. 1244-45). The trial court erred by immediately sentencing defendant without waiting twenty-four hours after the denial of the motion, as

30

required by La. Code Crim. P. art. 873.[14] The record reflects no waiver of this time period by defendant.

Nevertheless, in **State v. Augustine**, 555 So.2d 1331, 1333-1334 (La. 1990), the Louisiana Supreme Court indicated that a failure to observe the twenty-four hour delay provided in Article 873 will be considered harmless error where the defendant could not show that he suffered prejudice from the violation. See **State v. White**, 404 So.2d 1202, 1204–05 (La. 1981). In **Augustine**, the Louisiana Supreme Court concluded that prejudice would not be found if the defendant had not challenged the sentence imposed and the violation of the twenty-four hour delay was merely noted on patent error review. **Augustine**, 555 So.2d at 1334.

In the instant case, the record reflects that the defendant did not file a motion to reconsider sentence. Further, on appeal the defendant has not assigned error to the trial court's failure to observe the twenty-four hour delay, nor has he contested the sentences imposed. Under these circumstances, this patent sentencing error is harmless beyond a reasonable doubt and does not require a remand for resentencing. See **State v. Folse**, 2016-0808 (La. App. 1 Cir. 12/22/16), 2016 WL 7407412, *5, writ denied, 2017-0162 (La. 9/29/17), 227 So.3d 283.

**CONVICTIONS AND SENTENCES ON COUNTS ONE, THREE, AND FOUR AFFIRMED; CONVICTION AND SENTENCE ON COUNT TWO SET ASIDE; REMANDED FOR A NEW TRIAL ON COUNT TWO.**

---

[14] Louisiana Code of Criminal Procedure article 873 does not explicitly require a twenty-four hour delay in sentencing after the denial of a motion for a post-verdict judgment of acquittal. However, this court previously has applied the twenty-four hour delay required by Article 873 to motions for a post-verdict judgment of acquittal. See **State v. Coates**, 2000-1013 (La. App. 1 Cir. 12/22/00), 774 So.2d 1223, 1226.